No. 25-70006

# In the United States Court of Appeals for the Fifth Circuit

GARY WESTCOTT, SECRETARY FOR THE LOUISIANA DEPARTMENT OF PUBLIC
SAFETY; DARREL VANNOY, WARDEN OF THE LOUISIANA STATE
PENITENTIARY; JOHN DOES,
*Defendants-Appellants*

v.

JESSIE HOFFMAN,
*Plaintiff-Appellee*

———————————

On Appeal from the United States District Court
for the Middle District of Louisiana
No. 25-cv-169, Hon. Shelly D. Dick

———————————

**EMERGENCY MOTION FOR STAY OR VACATUR OF THE DISTRICT COURT'S
MARCH 11 PRELIMINARY INJUNCTION AND TO ENLARGE WORD LIMIT**

———————————

ELIZABETH B. MURRILL
Attorney General of Louisiana

OFFICE OF THE ATTORNEY
GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

MORGAN BRUNGARD
Deputy Solicitor General

CAITLIN HUETTEMANN
Assistant Solicitor General

## CERTIFICATE OF INTERESTED PERSONS

A certificate of interested persons is not required here because, under the fourth sentence of Fifth Circuit Rule 28.2.1, Appellants—as "governmental" parties—need not furnish a certificate of interested persons.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS .........................................i

TABLE OF AUTHORITIES...................................................iv

NATURE OF EMERGENCY ................................................1

INTRODUCTION...................................................................2

JURISDICTIONAL STATEMENT .....................................3

BACKGROUND ....................................................................3

STANDARD OF REVIEW......................................................9

ARGUMENT .......................................................................11

   I. PLAINTIFF IS NOT LIKELY TO SUCCEED ON HIS EIGHTH
      AMENDMENT CLAIM BECAUSE HE FAILED TO EXHAUST IT. ..............11

  II. EVEN IF IT WERE EXHAUSTED, PLAINTIFF'S EIGHTH AMENDMENT
      CLAIM IS NOT LIKELY TO SUCCEED ON THE MERITS. ........................15

    A. Nitrogen Does Not Present a Substantial Risk of Severe Pain. 18

      1. The district court erred in relying on long-rejected media
        reports from Alabama. ........................................................18

      2. The district court erred by suggesting that Plaintiff will
        hold his breath. ..................................................................21

      3. Plaintiff's Dr. Sautter and Dr. Bickler destroyed his case
        for "severe pain." ................................................................23

      4. The district court's purported credibility determinations
        between Dr. Bickler and Dr. Antognini are both
        immaterial and wrong.........................................................25

B. The Firing Squad Is Not a Sufficient Alternative......................30

   1. The firing squad is more physically painful than nitrogen hypoxia. ................................................................................31

   2. The district court's reliance on psychological harm is misplaced.................................................................................32

   3. Louisiana has legitimate penological reasons to prefer nitrogen over the firing squad. ...........................................34

III. THE REMAINING FACTORS FAVOR A STAY AND VACATUR. ................36

CONCLUSION .........................................................................................41

CERTIFICATE OF SERVICE.................................................................43

CERTIFICATE OF COMPLIANCE.........................................................44

# TABLE OF AUTHORITIES

**Cases**

*Ala. Pub. Serv. Comm'n v. S. Ry. Co.,*
341 U.S. 341 (1951) ............................................................. 40

*Anderson v. City of Bessemer City,*
470 U.S. 564 (1985) ....................................................... 25, 26

*Bargher v. White,*
928 F.3d 439 (5th Cir. 2019) ............................................. 11

*Barr v. Lee,*
591 U.S. 979 (2020) ............................................................. 2

*Big Tyme Invs., L.L.C. v. Edwards,*
985 F.3d 456 (5th Cir. 2021) ............................................. 10

*Bucklew v. Precythe,*
587 U.S. 119 (2019) ................................................... passim

*Calderon v. Thompson,*
523 U.S. 538 (1998) ........................................................... 38

*D.T. v. Sumner Cnty. Sch.,*
942 F.3d 324 (6th Cir. 2019) ............................................. 39

*Dennis Melancon, Inc. v. City of New Orleans,*
703 F.3d 262 (5th Cir. 2012) ............................................. 10

*Frazier v. Hamm,*
2025 WL 361172 (M.D. Ala. Jan. 31, 2025) .............. passim

*Glossip v. Gross,*
576 U.S. 863 (2015) ........................................................... 17

*Grayson v. Hamm,*
145 S. Ct. 586 (2024) ......................................................... 15

*Grayson v. Hamm,*
2024 WL 4701875 (M.D. Ala. Nov. 6, 2024) .............. 15, 20

*Hill v. McDonough,*
547 U.S. 573 (2006) ..................................................... 36, 37

*Hoffman v. Jindal,*
   No. 12-cv-796 (M.D. La.) ............................................................... 6, 7

*Hoffman v. Louisiana,*
   531 U.S. 946 (2000) ....................................................................... 4

*In re Blodgett,*
   502 U.S. 236 (1992) ..................................................................... 38

*In re Westcott,*
   No. 25-30088 (5th Cir.) .............................................................. 7, 37

*Johnson v. Johnson,*
   385 F.3d 503 (5th Cir. 2004) ....................................................... 14

*Lawson v. Aetna Ins. Co.,*
   41 F.2d 316 (4th Cir. 1930) ......................................................... 40

*Matter of Complaint of Luhr Bros., Inc.,*
   157 F.3d 333 (5th Cir. 1998) ....................................................... 26

*Mejia-Alvarenga v. Garland,*
   95 F.4th 319 (5th Cir. 2024) ........................................................ 13

*Moran v. Burbine,*
   475 U.S. 412 (1986) ..................................................................... 38

*Nelson v. Campbell,*
   541 U.S. 637 (2004) ................................................................. 36, 38

*Sells v. Livingston,*
   561 F. App'x 342 (5th Cir. 2014) .................................................. 10

*Sells v. Livingston,*
   750 F.3d 478 (5th Cir. 2014) ........................................................ 10

*Sepulvado v. Jindal,*
   729 F.3d 413 (5th Cir. 2013) ........................................................ 40

*Smith v. Comm'r, Ala. Dep't of Corr.,*
   2024 WL 266027 (M.D. Ala. Jan. 24, 2024) ................................. 15

*Smith v. Hamm,*
   144 S. Ct. 414 (2024) .............................................................. 16, 17

*Smith v. Hamm,*
   2024 WL 1160303 (M.D. Ala. Jan. 10, 2024) ............................... 15

*State v. Biden,*
    10 F.4th 538 (5th Cir. 2021) ............................................................ 23

*State v. Hoffman,*
    2020-00137 (La. 10/19/21), 326 So. 3d 232 ........................................... 4

*State v. Hoffman,*
    768 So. 2d 542 (La. 2000) .............................................................. 3, 4

*Turner v. Epps,*
    460 F. App'x 322 (5th Cir. 2012) .................................................... 10, 38

*United States v. U.S. Gypsum Co.,*
    333 U.S. 364 (1948) ...................................................................... 26

*Voice of the Experienced v. LeBlanc,*
    No. 24-30420 (5th Cir. July 7, 2024) ..................................................... 1

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989) .......................................................... 39

*White v. Johnson,*
    429 F.3d 572 (5th Cir. 2005) ....................................................... 12, 13

*Williams v. Estelle Unit Prison Offs.,*
    2024 WL 3026778 (5th Cir. June 17, 2024) ........................................... 14

**Statutes**

28 U.S.C. § 1292(a)(1) ........................................................................ 3

42 U.S.C. § 1997e(a) ........................................................................ 11

La. R.S. 15:569 ................................................................................ 5

**Other Authorities**

14A Cyc. of Federal Proc. § 73:96 (3d ed.) ............................................ 39

**Rules**

Fed. R. App. P. 8(a)(2)(A)(i) ................................................................. 1

Fed. R. App. P. 8(a)(2)(A)(ii) ................................................................ 1

Federal Rule of Appellate Procedure 27 ............................................. 1, 44

## NATURE OF EMERGENCY

Under <u>Federal Rule of Appellate Procedure 27</u> and this Court's Rule 27.3, Appellants (collectively, the State) file this emergency motion for (a) an immediate stay of the district court's March 11, 2025 Ruling and Order (App.919–948), (b) thereafter a vacatur of the preliminary injunction, and (c) an enlargement (by 3,100 words) of the Rule 27 word limit given the seriousness of the issues presented in this case. Urgency exists because the Order preliminarily enjoins Plaintiff's March 18 execution—6 days from now. <u>Accordingly, the State respectfully requests that this Court stay the Order as soon as practicable, thereafter vacate the preliminary injunction, and enlarge the Rule 27 word limit.</u>[1]

---

[1] Pursuant to this Court's Rule 27.4, counsel for the State notified Plaintiff of the State's intent to file this motion. Plaintiff opposes the requested relief and intends to file an opposition.

In addition, the State has styled this motion in terms of both a stay and vacatur, although the Court's precedents do not appear to articulate a meaningful difference between the two. Insofar as the State seeks a stay, the State asked the district court to (if it were inclined to issue an injunction) "make clear that it would deny a stay of that injunction, in order to facilitate appellate review." App.144. The district court did not do so and thus has "failed to afford the relief requested." <u>Fed. R. App. P. 8(a)(2)(A)(ii)</u>. And in all events, given the nature of the district court's injunction, seeking a stay from that court would be futile. *See* Unpublished Order, *Voice of the Experienced v. LeBlanc*, No. 24-30420 (5th Cir. July 7, 2024), ECF No. 41-1 (citing <u>Fed. R. App. P. 8(a)(2)(A)(i)</u>).

# INTRODUCTION

Seven days before his March 18 execution, the district court granted Plaintiff's motion for a preliminary injunction against his execution. This, even though Plaintiff has claimed to have a live controversy for eight months but declined to file this lawsuit until two weeks ago. Indeed, virtually everything in the district court's analysis could have been written several months ago. And yet, here the State is—forced, at the eleventh hour, to seek emergency relief from the appellate courts to ensure that justice is done.

The ruling below represents precisely the sort of "last-minute intervention by a Federal Court" that the Supreme Court has repeatedly criticized. *Barr v. Lee*, 591 U.S. 979, 981 (2020) (per curiam). And in fact, this is a particularly egregious example because it rejects a wall of Alabama district court, Eleventh Circuit, and Supreme Court precedents based on virtually the same method of execution (nitrogen hypoxia), virtually the same experts, and virtually the same arguments and facts. Indeed, if the district court were right, then the Supreme Court, the Eleventh Circuit, and the Alabama district courts have green-lighted four illegal executions. That is preposterous—and it is notable that the

district court did not deign to engage with those other decisions before reaching its preferred result. Instead, the district court summarily determined that the firing squad—which undisputedly is more physically painful than nitrogen hypoxia (which is physically painless)—is a feasible alternative that renders nitrogen hypoxia unconstitutional.

This is not how the Eighth Amendment or death-penalty litigation works. This Court should immediately stay and vacate the injunction, and grant the State's request to enlarge the word limit of this brief to accommodate the pressing issues.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## BACKGROUND

In the interests of time and efficiency, the State here addresses only the core relevant facts, and it expounds where necessary in the argument section below.

**A.** On the night before Thanksgiving Day in 1996, Plaintiff Jessie Hoffman kidnapped, robbed, and raped Mary "Molly" Elliot. *State v. Hoffman*, 768 So. 2d 542, 550 (La. 2000). Plaintiff kidnapped Molly at gunpoint and drove her to an ATM, where he forced her to withdraw $200

and robbed her. *Id.* Plaintiff subsequently raped Molly in the backseat of her own car in a remote area of St. Tammany Parish. *Id.*

He then marched her—still naked—"down a dirt path which was overgrown with vegetation and in an area full of trash used as a dump." *Id.* "Her death march ultimately ended at a small, makeshift dock" on Middle Pearl River, where Plaintiff "forced [her] to kneel" and "shot [her] in the head, execution style." *Id.* Molly "likely survived for a few minutes after being shot." *Id.* But she was not discovered until Thanksgiving Day, when a duck hunter came across her naked body on the dock. *Id.* at 549. For his part, Plaintiff "soon thereafter" took his girlfriend shopping with Molly's money. *Id.* at 550.

A jury convicted Plaintiff of first degree murder, and he was sentenced to death. *Id.* at 549; *see* App.15 ¶ 61. His direct appeal was litigated to finality. *Hoffman v. Louisiana*, 531 U.S. 946 (2000) (denying petition). And he exhausted all of his state and federal post-conviction remedies. *See State v. Hoffman*, 2020-00137 (La. 10/19/21), 326 So. 3d 232, 235–36, 242 (collecting his post-conviction cases).

**B.** Although lethal injection was Louisiana's method of execution when Plaintiff murdered Molly, drug companies have since made it

extraordinarily difficult for States to obtain the necessary drugs. As a result, Louisiana and other States recently have turned to nitrogen hypoxia because there are no supply concerns with nitrogen. For Louisiana, that time came in the spring of 2024, when the Legislature amended La. R.S. 15:569 to adopt nitrogen hypoxia as a method of execution. Nitrogen hypoxia is Louisiana's only currently available method. App.450 ¶ 17; App.724.[2]

Over the past year, Louisiana's Department of Public Safety & Corrections constructed a nitrogen hypoxia system that mirrors Alabama's—and since 2024, Alabama itself has successfully carried out four nitrogen hypoxia executions. In general terms, the system delivers pure nitrogen to a full-face silicon mask with a plexi-glass screen known as a "source respirator"—industrial grade and superior to medical grade masks. App.452–53 ¶ 31; App.834. Thick, cushion material presses against the face and creates a "virtually air tight seal." *Id.* The mask has

---

[2] Some citations of paragraphs within the State's proposed findings and conclusions of law trace back to outdated citations of volume 2 of the preliminary-injunction transcript. As of their Sunday filing deadline, the parties had the final version of the volume 1 transcript but only the rough transcript for volume 2, which is cited in the State's proposed findings and conclusions of law. But the State's appendix here includes the final version of that transcript. Accordingly, the State has endeavored to add citations to the final version of the transcript as well.

a one-way inlet valve allowing for airflow into the mask from the industrial tube that delivers both ambient air and nitrogen. *Id.* The mask also allows for exhaling through another one-way exhaust valve. *Id.*

The State's expert, Dr. Antognini, is the only expert in this case who inspected and tested Louisiana's system. Specifically, he laid down on the gurney with the mask on at the intended flow rate—and he testified that he "could breathe very comfortably with the mask on." App.838. He also took a video (Defs.' Ex. 19; App.842) demonstrating how quickly pure nitrogen displaces oxygen in the mask: By 30 seconds, the air inside the mask is only 4.4% oxygen; 1.8% by 40 seconds; and so on. App.849.

**C.** Almost immediately after the Legislature adopted nitrogen hypoxia, Plaintiff attempted to reopen a dismissed-as-moot case challenging Louisiana's lethal-injection protocol. *See Hoffman v. Jindal*, No. 12-cv-796 (M.D. La.). That case was dismissed a few years ago because Louisiana is currently unable to obtain the necessary drugs. With nitrogen now permitted under Louisiana law, however, Plaintiff filed a Rule 60(b)(6) motion claiming that "there has since been a material and extraordinary change of circumstances that gives rise to a live controversy between the parties." Mem. in Support of Mot. for Relief from

J. at 1, *Hoffman v. Jindal,* No. 12-cv-796 (M.D. La. June 14, 2024), ECF 318-1. For the next eight months, however, the district court took no action on that motion—and Plaintiff refused to file this lawsuit.

Indeed, it was not until Plaintiff's death warrant issued in early February that the *Hoffman I* docket bounced back. The district court issued an order reopening the case. ECF 337. But the State appealed and secured an administrative stay on the basis that this was an improper exercise of Rule 60(b)(6) authority. *See In re Westcott*, No. 25-30088 (5th Cir.). That case remains pending in this Court.

**D.** Once Plaintiff realized that he would be unable to use his old case as a subterfuge for challenging Louisiana's new method of execution, he filed this lawsuit (on February 25) and immediately (on February 26) sought to enjoin his execution. App.1–61 (Complaint); App.62–102 (preliminary-injunction motion). In the ensuing two weeks, the parties engaged in expedited discovery, motion practice, and an evidentiary hearing on Friday, March 7, followed by proposed findings and conclusions filed at 9am on Sunday, March 9.

This case has substantially narrowed in the meantime because the district court partially granted the State's motion to dismiss certain

claims from the bench on Friday (App.522–24), and yesterday (App.942–44) the court held that Plaintiff was unlikely to succeed on certain other claims. As things stand, therefore, the only claim before this Court is Plaintiff's Eighth Amendment challenge to nitrogen hypoxia.

Here are a few key facts that inform that challenge. To begin, as the district court recognized, both Plaintiff's and the State's experts "agree that nitrogen hypoxia does not produce physical pain." App.934. Plaintiff's case thus depends on alleged psychological pain. To that end, he testified that he is Buddhist and engages in meditative breathing twice a day, which requires concentrated "deep breaths"—both inhaling and exhaling. App.455 ¶ 42. He also testified that he plans to use his breathing techniques during his execution. App.455 ¶ 44. He put on a PTSD expert, Dr. Sautter, who agreed that Plaintiff has mastered his breathing techniques to control any PTSD issues—and so long as "he can practice the breathing, then he will be able to decrease his distress." App.491 ¶ 166. Plaintiff also put on another expert, Dr. Bickler, who testified that—with normal breathing, and especially with deep breaths as Plaintiff intends—unconsciousness will occur in less than a minute after pure nitrogen begins to flow into the mask. App.481 ¶ 138; App.783.

Dr. Bickler also testified that, at least in the assisted-suicide context, "allowing the free flow of a gas into the lungs but with no oxygen causes a gentle hypoxic death." App.803.

The State's expert, Dr. Antognini (whom the Alabama courts have credited), agreed on the key facts: "His opinion is that Louisiana's system will cause unconsciousness within 35 to 40 seconds (or perhaps sooner) once Plaintiff begins to inhale pure nitrogen—and he expects death to follow 'rapidly,' within 10 to 15 minutes." App.480 ¶ 137; *see* App.832.

For his part, Plaintiff proposed the firing squad and a drug cocktail known as DDMAPh as more humane alternative methods of execution that render nitrogen hypoxia unconstitutional. In granting Plaintiff's motion for preliminary injunction yesterday, the district court rejected DDMAPh (because the State cannot use drugs for execution purposes, App.941), but agreed that the firing squad is a suitable alternative. App.938–40. The court has thus enjoined Defendants from executing Plaintiff on March 18 via nitrogen hypoxia.

## STANDARD OF REVIEW

A preliminary injunction is an "extraordinary remedy," and the "burden of persuasion on all ... requirements" is on the moving party. *Big*

*Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 464 (5th Cir. 2021) (quotation omitted). Indeed, a preliminary injunction "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Dennis Melancon, Inc. v. City of New Orleans*, 703 F.3d 262, 268 (5th Cir. 2012) (cleaned up).

"A preliminary injunction is warranted only 'if the movant establishes: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Big Tyme Invs., L.L.C.*, 985 F.3d at 463–64 (quotation omitted).

This Court assesses the same factors in vacating stays and injunctions against executions. *See Sells v. Livingston*, 750 F.3d 478, 480–81 (5th Cir. 2014) (stay vacatur and injunction reversal); *Sells v. Livingston*, 561 F. App'x 342, 343–45 (5th Cir. 2014) (stay vacatur and injunction reversal); *Turner v. Epps*, 460 F. App'x 322, 323, 327 (5th Cir. 2012) (stay vacatur).

# ARGUMENT

The district court enjoined Plaintiff's execution on one claim—that execution by nitrogen hypoxia violates the Eighth Amendment. But Plaintiff is not likely to succeed on that claim because he failed to exhaust it and because it fails on the merits. Moreover, his extraordinary delay in bringing this claim in the first place reinforces that the equities require a stay and vacatur of the injunction.

## I. PLAINTIFF IS NOT LIKELY TO SUCCEED ON HIS EIGHTH AMENDMENT CLAIM BECAUSE HE FAILED TO EXHAUST IT.

**A.** The Prison Litigation Reform Act provides that "[n]o action shall be brought with respect to prison conditions ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The prisoner "must have 'pursue[d] the grievance remedy to conclusion'— substantial compliance with administrative procedures is not enough." *Bargher v. White*, 928 F.3d 439, 447 (5th Cir. 2019). Relevant here, the essential first step of "Louisiana's Administrative Remedy Procedure" is to "submit[] a request to the warden briefly setting out the basis for the claim and the relief sought." *Id.*

This obligation applies full bore in method-of-execution lawsuits, including where a plaintiff challenges potential procedures for administering a longstanding method of execution. *See, e.g.*, *White v. Johnson*, 429 F.3d 572, 574 n.1 (5th Cir. 2005) (in challenge to lethal injection, rejecting as unexhausted claim that "the State might use a cut-down procedure to gain venous access").

**B.** Plaintiff failed to comply with respect to his Eighth Amendment claim. On that claim, Plaintiff bears the burden of asserting, and then showing, that there is "a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Bucklew v. Precythe*, 587 U.S. 119, 134 (2019).

Plaintiff's pending grievances, however, never so much as mention an alternative method of execution, let alone suggest that it would significantly reduce a substantial risk of severe pain from nitrogen hypoxia. At most, Plaintiff vaguely asserts that Louisiana's three methods of execution—lethal injection, nitrogen hypoxia, and electrocution—are all unconstitutional and will be unconstitutionally administered. App.152–59.

It was not until Plaintiff filed his Complaint that he identified, for the first time, his Eighth Amendment claim: that the firing squad and DDMAPh are feasible and readily implemented alternatives that render nitrogen hypoxia unconstitutional. And that is fatal under *White*. There, although the plaintiff unquestionably exhausted a challenge to lethal injection, his subsequent challenge to a cut-down procedure for administering lethal injection was "barred from federal review by [his] failure to exhaust it pursuant to the PLRA." 429 F.3d at 574 n.1; *see Mejia-Alvarenga v. Garland*, 95 F.4th 319, 326 n.2 (5th Cir. 2024) ("Alternative holdings are not dicta and are binding in this circuit."). Since this Court has demanded precise exhaustion of claims regarding *one* method of execution, *a fortiori* the same precedents compel precise exhaustion of claims that depend on introducing *additional and different* methods of execution into the analytical framework. *White* ends Plaintiff's Eighth Amendment claim.

**C.** Despite the State's repeated arguments on this point (App.466–69), the district court never acknowledged *White*. Instead, the district court excused Plaintiff's failure to exhaust on two grounds.

*First*, the district court claimed that "there is no administrative process available for [him]" because Plaintiff's pending grievances may not be resolved until after his execution date. App.927 (bolding omitted). But that assumes that those pending grievances actually assert the Eighth Amendment claim he now presses. As just explained, they do not—and the district court cited no case suggesting that a prisoner can claim unavailability without first attempting to raise his claim in the grievance process.

*Second*, and perhaps recognizing as much, the district court claimed that Plaintiff "need not necessarily advance specific legal theories"—"fair notice" is sufficient, and "[t]he State was on notice that [Plaintiff] challenged his method of execution." *Id.* (quoting *Williams v. Estelle Unit Prison Offs.*, 2024 WL 3026778, at *3 (5th Cir. June 17, 2024)). But that excuse did not work in *White*. That is because the required level of detail depends on each "given case" and how much information is necessary to "giv[e] officials 'time and opportunity to address complaints internally.'" *Williams*, 2024 WL 3026778, at *3 (quoting *Johnson v. Johnson*, 385 F.3d 503, 516 (5th Cir. 2004)). Just as a global lethal-injection challenge in *White* did not put officials on notice of a challenge to a cut-down

procedure, so too a global claim that nitrogen, lethal injection, and electrocution are unconstitutional did not magically tell the State that two other methods of execution (which are not permitted under Louisiana law) render nitrogen unconstitutional. This is sand-bagging plain and simple—and this is not how PLRA exhaustion works. The Court need say no more in staying and vacating the preliminary injunction.

## II. EVEN IF IT WERE EXHAUSTED, PLAINTIFF'S EIGHTH AMENDMENT CLAIM IS NOT LIKELY TO SUCCEED ON THE MERITS.

If the Court reaches the merits, a stay and vacatur remain in order because Plaintiff has no viable Eighth Amendment claim. Every level of the federal courts—from Alabama district courts, to the Eleventh Circuit, to the Supreme Court—repeatedly has rejected Eighth Amendment challenges based on virtually the same method of execution and virtually the same expert testimony. *See Frazier v. Hamm*, 2025 WL 361172 (M.D. Ala. Jan. 31, 2025) (no appeal); *Grayson v. Hamm*, 2024 WL 4701875 (M.D. Ala. Nov. 6, 2024), *aff'd*, *Grayson v. Comm'r, Ala. Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), *stay of execution denied*, *Grayson v. Hamm*, 145 S. Ct. 586 (2024) (no noted dissents); *Smith v. Hamm*, 2024 WL 1160303 (M.D. Ala. Jan. 10, 2024), *aff'd*, *Smith v. Comm'r, Ala. Dep't of Corr.*, 2024 WL 266027 (M.D. Ala. Jan. 24, 2024), *stay of execution*

*denied*, *Smith v. Hamm*, 144 S. Ct. 414 (2024) (Sotomayor, Kagan, Jackson, JJ., dissenting). The State told the district court as much (App.117–18, 478)—yet rather than acknowledge this wall of precedent, the district court ignored it, relitigated the facts in those cases, and came to the opposite conclusion. This Court's intervention is thus necessary.

\*     \*     \*

"The Constitution allows capital punishment." *Bucklew*, 587 U.S. at 129. Indeed, "the Eighth Amendment does not guarantee a prisoner a painless death." *Id.* at 132. Instead, it bars only those "forms of punishment that intensif[y] the sentence of death with a (cruel) superaddition of terror, pain, or disgrace." *Id.* at 133 (cleaned up). And "perhaps" for that reason, the Supreme Court "has yet to hold that a State's method of execution qualifies as cruel and unusual." *Id.*

To that end, "where (as here) the question in dispute is whether the State's chosen method of execution cruelly superadds pain to the death sentence, a prisoner must show a feasible and readily implemented alternative method of execution that would significantly reduce a substantial risk of severe pain and that the State has refused to adopt without a legitimate penological reason." *Id.* at 134; *see id.* at 136–37

16

("[W]hen it comes to determining whether a punishment is unconstitutionally cruel because of the pain involved, the law has always asked whether the punishment 'superadds' pain well beyond what's needed to effectuate a death sentence."). Requiring a plaintiff to show that the challenged method "is sure or very likely to result in needless suffering," *Glossip v. Gross*, 576 U.S. 863, 881 (2015), is an "extremely demanding standard," *Smith*, 144 S. Ct. at 416 (Kagan, J., dissenting from the denial of application for stay and denial of certiorari).

Here, contrary to the district court's conclusion, Plaintiff failed at *Bucklew* Step Zero (*see infra* Section II.A)—his burden to show that Louisiana's nitrogen hypoxia protocol poses a substantial risk of severe pain. But, even if he had satisfied *Bucklew* Step Zero, Plaintiff (again, contrary to the district court's conclusion) independently failed to show that (1) the firing squad is a feasible and readily implemented alternative that would significantly reduce an alleged substantial risk of severe pain and (2) the State refused to adopt it without a legitimate penological reason. *See infra* Section II.B. And to be clear, none of these errors depends on credibility determinations—just basic facts and logic.

## A. Nitrogen Does Not Present a Substantial Risk of Severe Pain.

Start with the supposed risk of severe pain presented by nitrogen hypoxia. The district court's findings are demonstrably misguided and warrant this Court's emergency intervention.

### 1. The district court erred in relying on long-rejected media reports from Alabama.

The centerpiece of the district court's decision is a list of media reports regarding the four Alabama executions. In the court's words: "Eyewitness accounts from these executions are the most probative evidence of what death by forced inhalation of nitrogen looks like." App.931. This is astounding—both because Alabama courts have rejected such accounts as unreliable and because this district court refused to even acknowledge that across-the-board rejection.

Here, like the plaintiffs in the Alabama cases, the district court wields these media accounts as evidence of "suffering, including conscious terror for several minutes, shaking, gasping, and other evidence of distress." *Id.* The district court even adds its own rhetorical flourishes, such as "conscious struggling for life" and "vigorous convulsing and shaking." *Id.*

Just over a month ago, however, the *Frazier* court explained why this is a logical mistake. Those accounts are "insufficiently reliable because [the eyewitnesses] d[id] not know"—and could not know—"when the nitrogen began to flow." *Frazier*, 2025 WL 361172, at *11 (footnote omitted). Because they did not know time zero, the witnesses could not "'reliably pinpoint'" how soon after the introduction of nitrogen "'an inmate los[t] consciousness.'" *Id.* On top of that, the courts have recognized that "unconscious individuals experience involuntary movements," such as "'muscle tremors and convulsion-like activity.'" *Id.* at *12. It is thus "not supris[ing]" that the condemned inmates exhibited "breaths and even convulsions[] after the introduction of an inert gas— when a person is unconscious and unable to feel pain." *Id.* For that reason, "the evidence of Smith's, Miller's, and Grayson's movements during their respective executions does not support a finding that any of them experienced severe psychological pain or distress over and above what is inherent in any execution." *Id.*; *see id.* at *11 (rejecting argument that these reports "are evidence that inmates remained conscious after the nitrogen began flowing and were distressed and in pain").

To the extent this district court also invoked the Smith execution, the court ignored that his execution was principally complicated by his own "non-cooperation with the execution process," specifically his "breath-holding," which "would have increased the level of carbon dioxide in his body, acidifying his blood and increasing discomfort and distress." App.488 ¶ 158. As the Alabama courts recognized, the evidence from the Smith execution showed that Smith refused to inhale the nitrogen, which caused the reaction Plaintiff now highlights. *Frazier*, 2025 WL 361172, at *5 & nn.9–10, *11 n.20; *Grayson*, 2024 WL 4701875, at *21 ("Smith held his breath and struggled against the restraints while Miller did not."). On top of that, Smith's autopsy showed that he had "a synthetic cannabinoid" in his blood that "can cause hallucinations, vomiting, paranoia, and convulsions (seizures)"—which, in turn, may have made Smith's "convulsions more likely and pronounced." App.488 ¶ 158; *Grayson*, 2024 WL 4701875, at *17 n.18. None of this has anything to do with nitrogen's constitutionality or efficacy as a method of execution—it has everything to do with Smith's own actions.

By pretending that these Alabama court decisions do not exist and do not reject exactly what the district court did here, the court has

effectively thumbed its nose at those courts, basic common sense, and logic. Indeed, the court's refusal to engage with those decisions effectively admits that there is no way to overcome their reasoning. And this has nothing to do with credibility determinations. These are cold, hard facts that render the media accounts unreliable in service of the district court's proclamation that nitrogen hypoxia is unconstitutional. A stay and vacatur are thus independently warranted on this basis.

### 2. The district court erred by suggesting that Plaintiff will hold his breath.

The district court's next error is even more egregious: It blanketed its decision with an assumption that Plaintiff will hold his breath, refuse to breathe nitrogen, and thus increase an alleged sense of terror. The court did so by invoking Plaintiff's expert, Dr. Bickler. *See* App.934 ("[I]f the condemned holds his breath, Dr. Bickler opines that it could take 3 to 5 minutes to lose consciousness."); *accord* App.935, 936. And Dr. Bickler himself acknowledged that he was inflating his opinion with the "expect[ation] that [Plaintiff] would hold his breath and then probably attempt to breathe shallowly and then only slowly get hypoxic, all the while experiencing the effects of the progressing hypoxia and buildup of carbon dioxide in his blood." App.758. This is misdirection.

*First*, as the district court acknowledged, "Plaintiff admits that he will have the ability to breathe in the nitrogen as it is administered." App.925. In fact, Plaintiff also testified that he "plan[s] to use [his] meditative breathing techniques," which involve "deep breaths," if he is executed through nitrogen hypoxia. App.490 ¶ 164; *accord* App.925 (district court's conclusion that "there is no substantial burden to his exercise of rhythmic breathing"). There is thus no record basis for the district court's and Dr. Bickler's speculation that Plaintiff might self-inflict harm by refusing to breathe.

*Second*, this point matters because it directly impacts the amount of time between the initiation of pure nitrogen and Plaintiff's loss of consciousness. As the district court acknowledged, Dr. Bickler "candidly conceded that a person who is administered 100% pure nitrogen and is breathing normally will lose consciousness in less than one minute." App.934. But the court omitted that Dr. Bickler also conceded that it is possible that "[a] person who is taking deep breaths"—as Plaintiff testified he intends to do—"will lose consciousness even quicker than that." App.481 ¶ 138; App.783. Because that window will be exceedingly

narrow, the district court's trumpeting of "conscious psychological suffering" for several minutes is completely baseless. App.936.

*Third*, even if this record suggested that Plaintiff intends to hold his breath, that would bar him from obtaining a preliminary injunction. As this Court has recognized, it is black-letter law that "a party may not satisfy the irreparable harm requirement if the harm complained of is self-inflicted." *State v. Biden*, 10 F.4th 538, 558 (5th Cir. 2021) (alteration and citation omitted) (collecting authorities).

### 3. Plaintiff's Dr. Sautter and Dr. Bickler destroyed his case for "severe pain."

The foregoing points are important because they substantially constrain the analysis: (1) the Alabama media reports are not a valid basis for inferring evidence of *conscious* pain and suffering; and (2) Plaintiff's expert, Dr. Bickler, agrees that Plaintiff will be unconscious within a matter of seconds after pure nitrogen begins to flow. So, how can Plaintiff claim that he faces a substantial risk of severe pain within the relevant sliver of time? He can't—as evidenced by the testimony of his own experts that the district court ignored.

Take first his PTSD expert, Dr. Sautter, who ran a truck through Plaintiff's theory of the case. Dr. Sautter testified that "[i]t's really

amazing" how Plaintiff has used his Buddhist breathing techniques to "manag[e] his PTSD." App.491 ¶ 165. Not only that, but he also testified that Plaintiff will "be able to practice [the] breathing techniques while under psychological distress." App.491 ¶ 166. In his words, "if he can practice the breathing"—as the district court and Plaintiff confirmed he can and will, App.925—Plaintiff "will be able to decrease his distress." App.491 ¶ 166. That is damning testimony for any suggestion that Plaintiff faces a substantial risk of severe pain in the few seconds between the introduction of pure nitrogen and unconsciousness.

Take next Dr. Bickler, who made two of the most profound concessions during Plaintiff's opening case. *First*, he admitted—in line with Dr. Antognini's testimony—that, at least in "some instances," a person breathing pure nitrogen "is fooled because there is no clear indication that anything is amiss. Blackout occurs quickly without warning." App.781. *Second*, he admitted that, at least in the assisted-suicide context, "allowing the free flow of a gas into the lungs but with no oxygen causes a gentle hypoxic death." App.803.

How, then, could he plausibly assert that Louisiana's nitrogen system will somehow impose stark terror, pain, and suffering on

Plaintiff? Dr. Bickler's only answer was that death (when directed by a State) is different. App.804 ("[A]s I've said about a hundred times, that's a very different context than forced asphyxiation with nitrogen in a death chamber."). But Dr. Sautter was not concerned because, so long as Plaintiff "can practice the breathing, then he will be able to decrease his distress." App.491 ¶ 166. Moreover, "every method of execution involves a period during which the inmate experiences psychological pain because he realizes death is imminent." *Frazier*, <u>2025 WL 361172</u>, at *13. That does not automatically render his execution unconstitutional.

In short, Plaintiff's own witnesses gutted his argument that nitrogen hypoxia presents a substantial risk of severe pain.

### 4. The district court's purported credibility determinations between Dr. Bickler and Dr. Antognini are both immaterial and wrong.

Because Plaintiff has no viable Eighth Amendment claim, the district court's attempts to insulate its decision in "credibility" findings are irrelevant. The district court, of course, cannot "insulate [its] findings from review by denominating them credibility determinations." *Anderson v. City of Bessemer City*, <u>470 U.S. 564, 575</u> (1985). Instead, the court "must" "consider relevant documents or objective evidence that may

contradict the witness's story and whether a witness's story is internally consistent and plausible on its face." *Matter of Complaint of Luhr Bros., Inc.*, 157 F.3d 333, 338 (5th Cir. 1998). And when a district court fails to do so, this Court can "find clear error even in a finding purportedly based on a credibility determination." *Anderson*, 470 U.S. at 575 (citing *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). In fact, "it is [this Court's] duty as the reviewing court to correct this mistake." *Matter of Complaint of Luhr Bros., Inc.*, 157 F.3d at 339. Here, the district court's "credibility" determinations are more red herrings than important errors requiring correction by this Court.

**Dr. Antognini.** Start with the State's expert, Dr. Antognini, *whom the Alabama courts have universally credited. See Frazier*, 2025 WL 361172, at *11 ("[T]he Court assigns greater weight to Dr. Antognini's expert opinion that an inmate loses consciousness closer to thirty to forty seconds after nitrogen gas is introduced."); *id.* at *13 ("According to Dr. Antognini, whose opinion the Court credits, the period between the nitrogen's activation and loss of consciousness is likely less than a minute."); *Grayson*, 121 F.4th at 900 (affirming district court's finding that "Dr. Antognini's opinions [including that the nitrogen flow 'will lead

26

to unconsciousness within 10 to 40 seconds'] ... were 'more credible and persuasive than those of Dr. McAlary'"). (Speaking of Dr. McAlary, Plaintiff built his preliminary-injunction motion on Dr. McAlary—but after the State's opposition brief detailed Dr. McAlary's 100% loss rate to Dr. Antognini in the Alabama courts, App.117–30, Dr. McAlary disappeared from Plaintiff's briefing, he did not testify in Baton Rouge, and the district court's decision likewise ignores him.)

The district court made a big to-do about "not credit[ing] Dr. Antognini's opinion that the Louisiana's [sic] system 'will cause unconsciousness within 35 to 40 seconds or perhaps sooner once the inmate starts to inhale in 90 to 100% nitrogen gas.'" App.936. On the same page, however, the court did actually adopt his view as "the low end" of the period from nitrogen flow to unconsciousness. *See id.* & n.109 (citing Dr. Antognini). Moreover, as explained above, the district court could not actually reject Dr. Antognini's view because—as Dr. Bickler agreed—with normal breathing and deep breaths Plaintiff will be unconscious in far less than a minute after pure nitrogen begins to flow.

The district court also criticized Dr. Antognini for not "testing" his hypotheses "by observation of the Alabama executions." App.937. Never

mind that Dr. Bickler never witnessed one of those executions, either. And never mind that it is extremely difficult to secure a witness seat at any execution.

**Dr. Bickler.** Turning to Plaintiff's expert, Dr. Bickler, this is—respectfully—one of the most astounding examples of an unsupported expert opinion. He filed a declaration in this case with a grand total of *one* cited article. That article? His own "opinion" piece advocating against execution by nitrogen hypoxia and expressly based on all the media reports that the Alabama courts have rejected as unreliable. App.913. Said Dr. Bickler when asked about it: "I think that should be sufficient." *Id.*

That cavalier attitude revealed that, in fact, Dr. Bickler has zero research or studies suggesting that Plaintiff will suffer some sort of terror in the brief period between the initiation of nitrogen flow and unconsciousness. Indeed, he freely testified that "it's not just Smith's execution that has reinforced my opinion about the inadvisability of nitrogen, but it's all four of the executions using nitrogen that were done by the State of Alabama. In all four cases, the deaths by nitrogen asphyxiation were prolonged, apparently agonizing, evidently painful

and traumatic." App.740; *accord* App.741, 745, 746, 747, 750, 751, 752, 753, 755. As each of these citations reflect, Dr. Bickler expressly drew his opinion from the Alabama media reports and Dr. McAlary's own statements—all of which the courts have rejected time and again.

The district court tried to puff him up based on his "human hypoxia" research. App.932–33. But the court omitted what that actually involves: "slowly dropping subjects' 'oxygen saturation level to about 70 percent and sometimes lower, down to 50 percent,'" and then holding them in that reduced-oxygen state for several minutes. App.488 ¶ 159; App.867–68; App.769–70. That, of course, is nothing like the facts here, which will involve rapid administration of pure nitrogen—and Dr. Bickler admitted that he had never studied "a scenario of administering nitrogen at 95 percent or higher," as Louisiana will do here. App.488 ¶ 159; App.769–70. As Dr. Antognini put it, "probably at the 30- or 40-second level in the nitrogen hypoxia system, you've already gone past the lower level of what Dr. Bickler ... would normally study. So there isn't really a lot of time for somebody to develop symptoms before they become unconscious." App.868. The puffery thus gets Dr. Bickler nowhere.

One final note about Dr. Bickler's closing words at the preliminary-injunction hearing: Plaintiff rushed him back to the stand as a rebuttal witness to say that "the low oxygen experienced in the Louisiana protocol will make one very, very short of breath"—"extremely uncomfortable." App.911. Even if true, that is a *far cry* from "a substantial risk of severe pain," which was Plaintiff's burden to establish at this preliminary-injunction stage. *Bucklew*, 587 U.S. at 134. And that only confirms that Plaintiff comes nowhere close to satisfying *Bucklew* Step Zero. The Court should thus stay or vacate the injunction on that ground.

## B. The Firing Squad Is Not a Sufficient Alternative.

All of the foregoing is ultimately beside the point, however, because Plaintiff failed to actually prove up the remainder of the *Bucklew* inquiry. That inquiry required him to identify (1) a feasible and readily implemented alternative method of execution that would significantly reduce any alleged substantial risk of severe pain and (2) that the State has refused to adopt without a legitimate penological reason. *Bucklew*, 587 U.S. at 134. The district court thought he carried his burden by identifying the firing squad, but that is wrong on multiple levels.

### 1. The firing squad is more physically painful than nitrogen hypoxia.

Start with the undisputed fact that the firing squad would cause Plaintiff *more* physical pain than would nitrogen hypoxia. As the district court admitted, both Plaintiff's and the State's experts "agree that nitrogen hypoxia does not produce physical pain." App.934. By contrast, it is also undisputed that Plaintiff would be alive for at least three to four seconds after being shot by a firing squad (App.939)—and both Plaintiff's and the State's experts testified that the shattering of bones and tearing of issue would be extraordinarily painful. App.462–63 ¶¶ 78–81; App.875–77. (And that assumes a clean shot, rendering unnecessary a second volley or a mercy shot to the head. *Id.*; App.494 ¶ 175.) Even Plaintiff himself testified that he did not believe the firing squad was painless. App.494 ¶ 175. The State's expert also expressly compared nitrogen with the firing squad, concluding that the firing squad would be "more" painful—while Plaintiff's expert, Dr. Williams, refused to make a comparison. App.494 ¶ 176; App.877.

Given this undisputed evidence that the firing squad is actually *more* painful than nitrogen, it is remarkable that the district court refused to acknowledge this glaring problem. *See* App.493–94 (State's

proposed conclusions of law making this point). And that is a clear signal that something is amiss. The State is aware of no case where a court has found an Eighth Amendment violation by invoking a proposed alternative that is actually *more* physically painful than the challenged method. That is more than enough to stay and vacate the injunction below on the ground that Plaintiff failed to identify an alternative that would significantly reduce any alleged substantial risk of severe pain from nitrogen.

### 2. The district court's reliance on psychological harm is misplaced.

Recognizing that problem, the district court tried to reframe this analysis in terms of "psychological terror." App.939. The district court emphasized its view that Plaintiff would be conscious for only "3 to 4 seconds" after being shot, as compared to the supposed "duration of conscious suffering of 30 to 40 seconds" from nitrogen hypoxia. *Id*. This misdirection does not work for at least two reasons.

*First*, the district court never explained how a plaintiff could satisfy the *Bucklew* standard by proposing an alternative that is *more* physically painful, even if it is simultaneously *less* psychologically painful. It is unclear how those different metrics could be adequately compared

against each other in the *Bucklew* analysis (the district court cited no authority). And in all events, it cannot be the law that a State is penalized for not adopting a *more* physically painful method of execution. That would make a mockery of *Bucklew* and related cases.

*Second*, the district court badly misrepresented the relevant record evidence on psychological issues. The district court's cursory discussion implies that Plaintiff might face "psychological terror" for at most three to four seconds after he is shot, App.939, but that is misleading. For one thing, Plaintiff elicited no testimony about how severe "psychological terror" post-firing squad might be, even if for a few seconds—and one can imagine the horror of being alive with a gaping chest wound. *Cf.* App.495 ¶ 178; App.634 (Plaintiff's firing-squad expert, Dr. Williams, conceding "I offered no psychological evidence"). The district court thus had no evidentiary basis to suggest, comparatively, that the firing squad would "significantly reduce a substantial risk of severe pain" from nitrogen.

For another thing, the district court left out that Plaintiff's PTSD expert, Dr. Sautter, testified that Plaintiff's traumatic history of being held at gunpoint is "one of the stimuli" that could trigger Plaintiff's PTSD—and he acknowledged that this would be a problem if Plaintiff

were "placed in front of a firing squad." App.495–96 ¶ 179. The district court's intimation of a three-to-four-second period in question is thus wildly wrong: Plaintiff would be subject to psychological distress for the entire lead-up to his execution, including during the several minutes while he is positioned in front a firing squad, potentially hooded, and then forced to await gunshots that end his life. There is no world in which that testimony by Plaintiff's own expert somehow means that the firing squad is a dramatically less painful alternative to nitrogen.

### 3. Louisiana has legitimate penological reasons to prefer nitrogen over the firing squad.

Finally, even if the firing squad were an otherwise suitable alternative, there are legitimate penological reasons why Louisiana might choose nitrogen over the firing squad. As just explained, the undisputed evidence is that the firing squad is *more physically painful* than nitrogen. In its effort to efficiently and humanely carry out death sentences, therefore, Louisiana reasonably selected the least physically painful method vis-à-vis firing squad. *Cf. Bucklew*, 587 U.S. at 134 (even "traditionally accepted methods of execution—such as hanging, the firing squad, electrocution, and lethal injection—are [not] necessarily rendered

unconstitutional as soon as an arguably more humane method like lethal injection becomes available").

Consider also the logistical and emotional costs of the firing squad—requiring multiple individuals (who will know whether they fired a live or blank round, App.496 ¶ 181; App.632) to pull the trigger; preparing to clean an execution chamber covered in blood, bones, and tissue; and handling the shattered body of the condemned post-execution. None of these serious issues are presented by nitrogen hypoxia, which is quick and clinical. *Cf. Bucklew*, 587 U.S. at 134 ("a State has a legitimate interest in selecting a method it regards as 'preserving the dignity of the procedure'").

And finally, it is worth noting that—after being unable to obtain lethal-injection drugs for years—Louisiana adopted nitrogen on the heels of Alabama's first successful execution by nitrogen hypoxia. Louisiana's gravitation toward a viable method of execution (for which "'[n]o supply concerns exist'") is itself a "valid penological reason to decline to adopt [Plaintiff's] proposed alternative method." *Frazier*, 2025 WL 361172, at *13–14.

At bottom, therefore, Louisiana had legitimate penological reasons not to adopt the firing squad—and that independently dooms Plaintiff's Eighth Amendment claim.

## III. THE REMAINING FACTORS FAVOR A STAY AND VACATUR.

**A.** Plaintiff's failure to establish a likelihood of success on the merits ends the analysis for all practical purposes. But, even if the Court reaches the remaining factors, they weigh heavily in favor of Defendants.

*First*, Plaintiff's delay in filing this suit places the equities and the public interest squarely on the State's side. The Supreme Court has emphasized that federal courts must apply "a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." *Nelson v. Campbell*, 541 U.S. 637, 650 (2004). Indeed, "[l]ast-minute stays should be the extreme exception, not the norm, and 'the last-minute nature of an application' that 'could have been brought' earlier, or 'an applicant's attempt at manipulation,' 'may be grounds for denial of a stay.'" *Bucklew*, 587 U.S. at 150 (quoting *Hill v. McDonough*, 547 U.S. 573, 584 (2006)). For that reason, federal courts "'can and should' protect settled state judgments from 'undue

interference' by invoking their 'equitable powers' to dismiss or curtail suits that are pursued in a 'dilatory' fashion or based on 'speculative' theories." *Id.* at 151 (quoting *Hill*, <u>547 U.S. at 584</u>–85).

That precisely describes this case. Plaintiff told *this Court* just weeks ago that he has had a live controversy for eight months. *See* Pls' Opp. to Request for Admin. Stay at 9, *In re Westcott*, No. 25-30088 (5th Cir. Feb. 27, 2025) ("Plaintiffs diligently moved to reopen the proceedings [in July 2024] prior to the change in the law, as soon as a justiciable controversy re-emerged."). Yet he refused to file this lawsuit eighth months ago. Instead, he put all his eggs in a basket of hope that the district court would reopen his long-dismissed suit and allow him to skip the hassle of filing a new lawsuit. That strategy is inexplicable—but it is also an undisputed fact.

Now, Plaintiff tries to turn his delay on the State by protesting (App.67–68) that the State should have just allowed his procedurally wrong invocation of Rule 60(b)(6) to proceed apace. But the rules in this Court's precedent say that Plaintiff cannot use Rule 60(b)(6). That is not the State's fault. He, the State, and the Court are in this eleventh-hour time crunch solely because he refused to file *this* lawsuit eight months

ago. And to drive this point home, there is nothing in the district court's analysis from yesterday's order that could not have been written several months ago. Whether the Court deems that delay or manipulation, it is a fact that tilts the equities in the State's favor.

*Second*, the State (and therefore also the public because the factors merge) has an unquestionably compelling interest in Plaintiff's execution. *See Bucklew*, 587 U.S. at 150 ("Under our Constitution, the question of capital punishment belongs to the people and their representatives ...."); *Nelson*, 541 U.S. at 644 ("[A] State retains a significant interest in meting out a sentence of death in a timely fashion."); *In re Blodgett*, 502 U.S. 236, 239 (1992) (The State's "sovereign power to enforce [its] criminal law" carries "great weight."); *Calderon v. Thompson*, 523 U.S. 538, 556 (1998) ("To unsettle these expectations [of finality] is to inflict a profound injury to the 'powerful and legitimate interest in punishing the guilty,' an interest shared by the State and the victims of crime alike." (quotation omitted)); *Moran v. Burbine*, 475 U.S. 412, 426 (1986) (recognizing "society's compelling interest in finding, convicting, and punishing those who violate the law"); *Turner*, 460 F.

App'x at 331 (emphasizing that courts must "give appropriate weight to ... the State's interests in carrying out [an] execution as scheduled ....").

And *third*, Plaintiff has no viable assertion of irreparable harm on the other side of the ledger. His only theory of irreparable harm is that he "will be executed in violation of his constitutional rights." App.97. But that theory falls apart since he has no likelihood of success on the merits. Moreover, to the extent he suggests his showing of irreparable harm would alone be "dispositive," he is wrong. App.97 (citing *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019)). What the Sixth Circuit actually held in *D.T.* was that the *absence* of irreparable harm was dispositive. *See* 942 F.3d at 327 ("Was the district court wrong to stop the inquiry after finding no irreparable injury? No. When one factor is dispositive, a district court need not consider the others.").

In addition, this Court has rejected limiting the preliminary-injunction inquiry to irreparable harm. *See White v. Carlucci*, 862 F.2d 1209, 1211 n.1 (5th Cir. 1989) ("Plaintiff would have us ... order the injunction to issue if we find that irreparable injury was either established or need not be. Such a result would be inappropriate."); *accord* § 73:96, 14A Cyc. of Federal Proc. § 73:96 (3d ed.) ("[E]nforcement

of a constitutional state statute will not be enjoined by a federal court merely because it will cause irreparable injury." (citing *Ala. Pub. Serv. Comm'n v. S. Ry. Co.*, [341 U.S. 341](#) (1951); *Lawson v. Aetna Ins. Co.*, [41 F.2d 316](#) (4th Cir. 1930))). And for good reason: Plaintiff's theory would entitle every prisoner with a death warrant to a preliminary injunction based on nothing more than the warrant's existence. That is not the law.

**B.** For its part, the district court oddly suggested that the nitrogen protocol's confidential nature and the public's "interest in knowing how its government operates" somehow warrant an injunction. App.946. As the district court is aware, this Court previously *reversed* that court (in Plaintiff's original lawsuit, no less) for holding that a related plaintiff "was likely to prevail on his claim that the Due Process Clause of the Fourteenth Amendment entitles him to prompt and detailed disclosure of Louisiana's most recent execution protocol." *Sepulvado v. Jindal*, [729 F.3d 413, 418](#) (5th Cir. 2013). Absent a discovery order, therefore, the State has no freestanding obligation to disclose the protocol under federal or State law. Moreover, it bears noting that the district court's analysis from yesterday has nothing to do with the nitrogen protocol. So all this is beside the point.

The district court also found it "in the best interests of the public to examine this newly proposed method of execution on a fully developed record." App.946. But the court has no authority to grant interim relief that does not satisfy the demanding preliminary-injunction standard. Indeed, it is difficult to understand the district court's final notes (App.946) as anything more than a mere attempt to delay Plaintiff's execution. There is no legal basis for such delay.

## CONCLUSION

The Court should immediately stay, and vacate, the March 11 Order enjoining Plaintiff's March 18 execution.

Respectfully submitted,

Dated:    March 12, 2025

ELIZABETH B. MURRILL
Attorney General of Louisiana

*J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA
Solicitor General

ZACHARY FAIRCLOTH
Principal Deputy Solicitor General

MORGAN BRUNGARD
Deputy Solicitor General

CAITLIN HUETTEMANN
Assistant Solicitor General

OFFICE OF THE ATTORNEY GENERAL
1885 N. 3rd St.
Baton Rouge, LA 70802
(225) 506-3746
AguinagaB@ag.louisiana.gov

*Counsel for Appellants*

**CERTIFICATE OF SERVICE**

I certify that on March 12, 2025, I filed the foregoing brief with the Court's CM/ECF system, which will automatically send an electronic notice of filing to all counsel of record.

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

## CERTIFICATE OF COMPLIANCE

Pursuant to Fifth Circuit Rule 32.3, the undersigned certifies that this motion complies with:

(1) the type-volume limitations of Federal Rule of Appellate Procedure 27(d)(2) because it contains 8,247 words, which is within the enlarged limit sought by this motion; and

(2) the typeface requirements of Rule 32(a)(5) and the type-style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface (14-point Century Schoolbook) using Microsoft Word 2016 (the same program used to calculate the word count).

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA

Dated:    March 12, 2025