No. 25-70006

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

JESSIE HOFFMAN,

*Plaintiff-Appellee/Cross-Appellant*

v.

GARY WESTCOTT, Secretary, Louisiana Department of Public Safety and Corrections, in his official capacity, *et al.*,

*Defendants-Appellants/Cross-Appellees.*

**On Appeal from the United States District Court
for the Middle District of Louisiana
No. 25-cv 169, Hon. Shelly D. Dick**

## PLAINTIFF-APPELLEE'S BRIEF IN OPPOSITION TO DEFENDANTS-APPELLANTS' MOTION TO STAY OR VACATUR OF THE DISTRICT COURT'S PRELIMINARY INJUNCTION

Cecelia Trenticosta Kappel
La. Bar No. 32736
Loyola Center for Social Justice
7214 St. Charles Ave. Box 907
New Orleans, Louisiana 70118
Tel: 504-861-5735
Email: ckappel@defendla.org

Samantha Bosalavage Pourciau
Promise of Justice Initiative

Rebecca L. Hudsmith
Office of the Federal Public Defender
for the Middle and Western Districts of Louisiana

Hugham Chan
Crowell & Moring LLP

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the Judges of this Court may evaluate possible disqualification or recusal.

Plaintiff-Appellee/Cross-Appellant

    Jessie Hoffman

Counsel for Plaintiff-Appellee/Cross-Appellant

    Cecelia Trenticosta Kappel, Loyola Center for Social Justice

    Samantha Bosalavage Pourciau, Promise of Justice Initiative

    Rebecca L. Hudsmith, Office of the Federal Public Defender for the Middle and Western Districts of Louisiana

    James K. Stronski, Crowell & Moring LLP

    William H. Frankel, Crowell & Moring LLP

    David Lindner, Crowell & Moring LLP

    Harry Cohen, Crowell & Moring LLP

    Hugham Chan, Crowell & Moring LLP

    Ellen M. Halstead, Crowell & Moring LLP

    Adam J. Singer, Crowell & Moring LLP

    April Barnard, Crowell & Moring LLP

Counsel for Defendants-Appellants/Cross-Appellees

    Elizabeth B. Murrill, Attorney General of Louisiana

J. Benjamin Aguinaga, Solicitor General

Zachary Faircloth, Principal Deputy Solicitor General

Morgan Brungard, Deputy Solicitor General

Caitlin Huettemann, Assistant Solicitor General

Jeffrey K. Cody, Shows, Cali & Walsh, L.L.P.

Caroline M. Tomeny, Shows, Cali & Walsh, L.L.P.

Brooke L. R. Ydarraga, Shows, Cali & Walsh, L.L.P.

Randal J. Robert, Butler Snow, LLP

Connell L. Archey, Butler Snow, LLP

Jonathan R. Vining, Louisiana Department of Public Safety & Corrections

## STATEMENT REGARDING ORAL ARGUMENT

The district court preliminarily enjoined Mr. Hoffman's execution date based on factual findings and credibility determinations of experts, made after a day-long hearing. This Court should review the State's attempt to challenges these findings and determinations under a deferential standard of review. In light of the deference due to the district court's findings, Mr. Hoffman does not believe that oral argument would significantly aid the Court in its decisional process.

## <u>TABLE OF CONTENTS</u>

CERTIFICATE OF INTERESTED PERSONS ......................................... i

STATEMENT REGARDING ORAL ARGUMENT ............................... i

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ......................................................5

STATEMENT OF ISSUES ..................................................................6

STATEMENT OF THE CASE..............................................................8

I.    BACKGROUND.........................................................................8

    A.    Statutory Background...........................................................8

    B.    Procedural Background .........................................................8

    C.    The Evidentiary Record Supports a Preliminary Injunction...............13

        1.    The Nitrogen Gassing Protocol .................................13

        2.    Evidence that Execution by Nitrogen Gassing is Cruel and Unusual Punishment.........................................14

            a.    Substantial risk of serious harm .....................14

            b.    Alternative Methods that Would Significantly Reduce the Risk of Pain...............17

STANDARD OF REVIEW ................................................................17

SUMMARY OF THE ARGUMENT ...................................................20

ARGUMENT.....................................................................................21

I.    THE COURT SHOULD DENY THE MOTION FOR STAY BECAUSE THE STATE DOES NOT EVEN ATTEMPT TO ADDRESS THREE OF FOUR RELEVANT FACTORS...........................21

II.   THE DISTRICT COURT CORRECTLY CONCLUDED THAT MR. HOFFMAN HAD A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS OF HIS EIGHTH AMENDMENT CLAIMS. ........................................................23

    A.    Execution by Nitrogen Hypoxia Violates the Eighth Amendment's Ban Against Cruel and Unusual Punishment, Especially as Applied to Mr. Hoffman, who suffers from PTSD.......25

-i-

1. The district court appropriately found that Dr. Bickler credibly testified that Mr. Hoffman would suffer extended terror if executed by nitrogen hypoxia. ...................................26

2. The district court appropriately credited Dr. Williams' testimony to conclude that death by firing squad will cause less terror than nitrogen hypoxia. ...............................36

B. The Court Should Affirm the Injunction on the Ground That Mr. Hoffman is Likely to Succeed on His Eighth Amendment As-Applied Challenge. ..............................................................38

C. Mr. Hoffman Pursued Administrative Remedies, But the State Made Them Unavailable to Him. ........................................39

D. Even if the ARP Process were Available, which it was Not, Mr. Hoffman Exhausted His Eighth Amendment Claim (and Others) Under the Prison Litigation Reform Act. ...........................................43

III. THE DISTRICT COURT ERRED IN DISMISSING THE RLUIPA CLAIM AND THERE WAS SUFFICIENT EVIDENCE TO FIND THAT MR. HOFFMAN HAD A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON IT. ...........................46

A. RLUIPA claims are evaluated by a two-part test. ...........................47

B. The district court erred by determining the reasonableness and significance of Mr. Hoffman's Buddhist beliefs. ...............................48

C. The district court's dismissal of the RLUIPA claim is inconsistent with other findings made by the district court in its Order. ..................................................................................................51

D. The State cannot show that it has a compelling interest that is narrowly tailored. .......................................................................52

E. The District Court Erred by Finding Mr. Hoffman Does Not Have a Substantial Likelihood of Success of Prevailing on His Right to Counsel and Access to the Courts Claim (Count IV). ..........54

CONCLUSION. ...................................................................................................59

CERTIFICATE OF COMPLIANCE ..................................................................61

## **INTRODUCTION**

On March 11, 2025, following the expedited timeline requested by the State and a 12-hour evidentiary hearing, Chief Judge Shelly Dick granted Mr. Hoffman's request for a preliminary injunction and stayed Mr. Hoffman's execution. ROA.3116. The State disagrees with the district court's reasoning, and on that basis seeks emergency relief. The Court should deny that relief and address the merits in due course.

The State's motion is premised on its claim that an emergency justifies the extraordinary remedy of staying the district court's grant of a preliminary injunction. Stay Mot. at 1.[1] There is no such emergency. By operation of Louisiana law, the State may not execute Mr. Hoffman on March 18, 2025, no matter how this Court resolves its motion and this appeal. In light of the district court's preliminary injunction, Louisiana law mandates that the March 18, 2025 warrant be reset for not less than thirty (30) days from the date that the stay is ultimately dissolved. *See* La. R.S. § 15:567(C).

---

[1] "Stay. Mot." refers to Defendants-Appellants' Emergency Motion for Stay of Vacatur of the District Court's March 11 Preliminary Injunction, filed with this Court on March 12, 2025 (Dkt. No. 8). Mr. Hoffman's response to the State's Stay Motion is incorporated into this principal brief based on the Court' directions. The Court treated the State's stay motion as a brief, re-entering it on the docket hours after the initial motion filing with a note stating "Appellant's Brief Filed." Dkt. 8, 25. The Court near-simultaneously issued an Order stating "XA/Pet's Brief due on 3/13/2025" (Dkt. 24), thus directing Mr. Hoffman to respond via a brief.

Specifically, Louisiana law provides several mandatory "conditions precedent to execution" which, if not complied with, will invalidate an execution warrant. *See* La. R.S. § 15:567; *see also* La. R.S. § 15:569 (providing the mandatory notice requirements regarding the method by which an execution will take place). Section 15:567 expressly provides that, in the event a federal court grants a stay of an execution, the mechanism and timeframe for going forward with any future execution warrant is as follows:

> *If any federal or Louisiana court grants a stay of execution*, or if the governor of Louisiana grants a reprieve, the trial court *shall* reset the execution date at *not less than thirty days nor more than forty-five days* from the dissolution of the stay order, or termination or expiration of the reprieve.

La. R.S. § 15:567(C) (emphasis added). Pursuant to this mandatory provision, courts have long recognized that the grant of a stay by either a state or federal court requires the state trial court to reset the execution date "not less than thirty days nor more than forty-five days" from the dissolution of the stay order.[2] Thus, the March 18, 2025 warrant is now moot as a matter of law: Even if this Court were to vacate the preliminary injunction, the state trial court must reset the execution date to between

---

[2] *See, e.g.*, *Byrne v. Roemer*, 847 F.2d 1130, 1132 (5th Cir. 1988) (noting that, "[f]ollowing the directive of the Louisiana statute, on May 10, 1988, a Louisiana state district judge set June 14, 1988-thirty-six days from the date on which this court dissolved Byrne's stay-as the date on which Byrne is to be executed"); *Knighton v. Maggio*, 740 F.2d 1344, 1346 (5th Cir. 1984) (noting the trial court's resetting of the original execution date after the stay dissolved); *Baldwin v. Maggio*, 715 F.2d 152, 154 (5th Cir. 1983) ("Louisiana law requires the court of original jurisdiction to fix an execution date not less than thirty days nor more than forty-five days from the dissolution of our stay. La. Rev. Stat. Ann. § 15:567").

30 and 45 days from the dissolution. There is therefore no need for emergency relief, and the Court should allow this appeal and cross-appeal to proceed in due course.

In any event, the State has engineered the last-minute nature of its request to this Court. Mr. Hoffman has exercised the utmost diligence in attempting to have the merits of his claims fully heard in a non-emergency setting, not under warrant of execution. As set forth in more detail below, in June 2024, Mr. Hoffman attempted to move to reopen his original 2012 methods challenge in light of the district court's ruling that, if now-Governor Landry is successful in enacting "an alternative means of execution in Louisiana," the parties would have "an entirely different execution protocol over which to litigate."[3] In response, the State did not respond that Mr. Hoffman should file a new lawsuit, as it does here. Instead, they asserted that any claims were not ripe: "there are no procedures for carrying out executions under the new law, and so *no procedures for Plaintiffs to challenge*."[4]

This, of course, flies in the face of the State's arguments before this Court that Mr. Hoffman should have sued eight months ago and merely wanted to avoid the "hassle" of initiating a new suit.  Stay Mot. at 37.  All the while, the Department of Public Safety and Corrections ("DPSC") was actively drafting a new protocol, the

---

[3] *Hoffman v. Jindal et. al.*, No. 12-796, 2022 U.S. Dist. LEXIS 198291 at *8 (M.D. La. Nov. 1, 2022), ECF 317 at 4.

[4] Defendants' Opposition to Plaintiffs' Mot. For Relief from J. at 2, *Hoffman v. Jindal et. al.*, No. 12-796 (M.D. La. July 24, 2025) (emphasis added).

existence of which the DPSC continued to hide until February 10, 2025, when the Governor put out a press release. *See* <u>ROA.768-69</u> (noting that the State's privilege log listed draft protocols dating back to August 2024). Suddenly, the State was in a hurry to execute Mr. Hoffman with only a month's notice, and even then, the State refused to disclose the new protocol and only informed Mr. Hoffman as to the method of execution on February 20, eight days after the issuance of his warrant. <u>ROA.136</u>.

It is only due to the intransigence and obfuscation orchestrated by the State that Mr. Hoffman's claims have not been adjudicated on the merits and have only been heard on an expedited basis at the preliminary injunction hearing. It is no surprise that the State does not even attempt to show that the balance of the equities weigh in favor of a stay. The State's Stay Motion should be denied, and the appeal should be allowed to proceed.

## <u>JURISDICTIONAL STATEMENT</u>

Defendants-Appellants/ Cross-Appellees' jurisdictional statement is complete and correct.

## STATEMENT OF ISSUES

I.     Whether the Court should deny Defendants-Appellants/Cross-Appellees' (the "State") motion to stay the district court's judgment and proceed with a March 18, 2025 execution of Plaintiff-Appellee/Cross-Appellant Jessie Hoffman ("Mr. Hoffman") where the State does not address three of the four factors for a stay to issue, has failed to at least identify any irreparable harm absent a stay, has itself caused the rushed nature of these proceedings, and Mr. Hoffman will undeniably be irreparably harmed if his execution proceeds before his case is heard on the merits.

II.     Whether the district court correctly granted a preliminary injunction temporarily staying Mr. Hoffman's previously-scheduled March 18, 2025 execution date where (a) Mr. Hoffman demonstrated a substantial likelihood of success on his Eighth Amendment claim; and (b) as an alternative basis for affirmance, it also is substantially likely that execution by nitrogen gassing violates the Religious Land Use and Institutionalized Persons Act, Pub. L. 106–274, codified as 42 U.S.C. § 2000cc et seq ("RLUIPA") (Count VI) by interfering with his ability to practice meditative breathing according to his Buddhist faith.

III.     Whether the district court erred by finding that Mr. Hoffman did not show a substantial likelihood of success on his right to counsel and access to the

courts claim (Count IV) pursuant to the First, Sixth, and Fourteenth Amendments of the United States Constitution.

## STATEMENT OF THE CASE

### I.   BACKGROUND

#### A.   Statutory Background

From 1991 through June 2024, Louisiana law authorized only lethal injection as the method of execution. La. R.S. § 15:569 (1991). In March 2024, the Louisiana legislature amended La. Rev. Stat. § 15:569 and § 15:570 and expanded the manner in which Louisiana can execute condemned inmates by adding nitrogen hypoxia and electrocution. *See* La. Acts 2024, 52nd Ex. Sess., No. 5, §1 (eff. July 1, 2024). As of July 2024, the Secretary of the DPSC now has the unfettered authority to choose between nitrogen hypoxia, lethal injection, or electrocution in carrying out a sentence of death. La. Rev. Stat. § 15:569(A)(1)–(3).

#### B.   Procedural Background

On June 27, 1998, a St. Tammany Parish jury issued a death verdict after finding Jessie Hoffman guilty of first-degree murder.[5]  Mr. Hoffman is currently in the custody and control of the DPSC and is held on Death Row at the Louisiana State Penitentiary in Angola, Louisiana ("Angola" or "LSP").  On February 12, 2025, his execution warrant was signed and execution set for March 18, 2025. The DPSC, however, only informed him on February 20, 2025, that his execution would be by

---

[5] *State v. Hoffman*, 768 So.2d 542 (La. 2000).

nitrogen hypoxia, which is a method of execution that Louisiana has never used before.

Mr. Hoffman timely brought this suit to challenge that method of execution. Beginning in 2012, counsel for Mr. Hoffman attempted to obtain a copy of the DPSC's then-current execution protocol. After the DPSC denied the public records requests, Mr. Hoffman submitted Administrative Remedy Procedures ("ARPs") asserting that he had no notice of how the State would seek to execute him and requesting a copy of the current protocol.  The DPSC rejected these requests.

In December 2012, Mr. Hoffman brought an action in the United States District Court for the Middle District of Louisiana pursuant to 42 U.S.C. § 1983 for violations and threatened violations of his rights under the First, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.  *See Hoffman v. Jindal*, No. 3:12-cv-00796-SDD-EWD (M.D. La.) ("No. 12-796").  On May 7, 2014, the parties agreed to stay the proceedings and that the State would not carry out any executions during the pendency of the stay, and that the stay would not be construed as dilatory. No. 12-796, ECF No. 178. The State filed unopposed motions to continue the stay, asserting that "the facts and issues that are involved in this proceeding continue to be in a fluid state[.]" No. 12-796, ECF Nos. 181, 187, 196, 226.

The continuation of the stay came to an end in 2021, when the State filed a motion to dismiss, contending that the DPSC "ha[d] no ability to obtain the lethal

injection drugs authorized by [the DOC's] current protocol nor any other potential lethal injection drugs in the foreseeable future."[6] This led the district court to dismiss the suit without prejudice.[7]  In response to Mr. Hoffman's motion to reconsider, the district court noted that, "[i]f Attorney General Landry is somehow successful in the future at accomplishing that which has yet to be accomplished by the legislature— an alternative means of execution in Louisiana, Plaintiffs and Defendants will have an entirely different execution protocol over which to litigate."[8]

In February of 2024, the Louisiana Legislature passed Act 5 of the Second Extraordinary Session of 2024, amending La. R.S. § 15:569-70 to add two new methods of execution in addition to lethal injection—nitrogen gas and electrocution—effective July 1, 2024. La. R.S. § 15:569 (West 2024).

In April of 2024, in light of the new legislation, Mr. Hoffman filed a new grievance with the prison challenging all three statutory methods of execution. This grievance was rejected as "premature" as the law had "yet to take legal effect." *See infra*.  Mr. Hoffman tried again after July 1, when the statute went into effect. He received the same response. *Id.*

---

[6] No. 12-796, ECF No. 263-1, at 4.

[7] No. 12-796, ECF No. 312.

[8] *Hoffman v. Jindal*, No. 12-796, 2022 U.S. Dist. LEXIS 198291, at *8 (M.D. La. Nov. 1, 2022), ECF No. 317.

Mr. Hoffman filed yet another grievance, this time invoking the emergency provision, on February 11, 2025, after receiving notice of his death warrant, contesting the method of execution and seeking a copy of the protocol. ROA.1903. The State responded that they would issue him a response within 40 days, that is, after the then-scheduled execution date. ROA.1901-03.

After the district court granted Mr. Hoffman's motion to reopen the proceedings in light of the new protocol on February 21, 2025, the State sought mandamus and a stay from this Court on February 23, which effectively halted any progress in the 12-796 case. *See In re Westcott*, No. 25-30088 (5th Cir.). On the verge of an execution that would violate, at a minimum, his constitutional rights, Mr. Hoffman commenced the underlying district court action under 42 U.S.C. § 1983 on February 25, 2025; moved for a preliminary injunction on February 26, 2025; and moved for expedited discovery and a scheduling order on February 27, 2025. Mr. Hoffman proposed a scheduling order that ended with a hearing on and/or after March 13 to have a sufficient time frame to conduct discovery. ROA.535. The State responded in opposition to the motion for expedited discovery and proposed a different schedule that set the preliminary injunction hearing for March 7, 2025. ROA.592–93. The Court conducted a telephonic status conference on February 28, 2025, granted the State's proposed schedule, ordered expedited discovery and scheduled a preliminary injunction hearing for March 7, 2025. ROA.660. The State

filed identical pleadings opposing the preliminary injunction motion and moving to dismiss the complaint on March 3, 2025.

On March 6, 2025, the district court granted in part and denied in part the State's motion to dismiss. ROA.18; *see* R. Dec. 79.  Assigning oral reasons at the beginning of the evidentiary hearing on March 7, 2025, the district court dismissed Mr. Hoffman's procedural due process claim in light of the fact that the State had disclosed the unredacted execution protocol on March 3, 2025, and also denied Mr. Hoffman's RLUIPA claim, finding that the nitrogen gas protocol did not substantially burden the practice of his religion. ROA.3131-32; ROA.3139-40.

An evidentiary hearing was held on March 7, 2025, at which the district court heard nearly twelve hours of testimony. ROA.3091. Mr. Hoffman moved to reconsider the dismissal of his RLUIPA claim in light of the evidence adduced at the hearing, which the district court took under advisement. ROA.3431; ROA.3532.

After post-hearing briefing was submitted by both parties on March 9, 2025, on March 11, 2025, the district court entered a ruling granting in part and denying in part Mr. Hoffman's motion for a preliminary injunction, finding Mr. Hoffman prevailed on his Eighth Amendment claim, but denied the preliminary injunction on the other claims, including the access to counsel claim. ROA.3087.  The district court also denied Mr. Hoffman's motion to reconsider the dismissal of the RLUIPA claim. *Id.*

**C.     The Evidentiary Record Supports a Preliminary Injunction.**

**1.     The Nitrogen Gassing Protocol**

The nitrogen gassing protocol provides for execution by forced nitrogen gassing. *See generally* ROA.3619-52.  Pursuant to the nitrogen gassing protocol: Mr. Hoffman will be strapped to a gurney, ROA.3643; (b) the mask—a continuous flow, full face, supplied air respirator with head straps—will be placed on Mr. Hoffman and cover his entire face, ROA.3642; and (c) Mr. Hoffman will remain strapped to the gurney with the mask covering his face for a significant period of time, starting with a two-minute monitoring period, for the time it takes to engage with his spiritual advisor and carry out the spiritual advisor's approved written plan, for several more minutes while the Warden opens the curtain, turns on the microphone and gives Mr. Hoffman up to two more minutes to make a last statement, and then for the time it takes the Warden to notify the witnesses that the state is carrying out the execution, ROA.3643-44, *id.* at 25–26.  The nitrogen hypoxia system uses industrial grade, not medical grade, nitrogen.  ROA.3297 (Tr. at 175:8–17).  When the system is activated, the industrial grade nitrogen will be introduced into the mask at a flow rate of 70 L/minute for fifteen (15) minutes or five minutes following a flatline indication on the electrocardiogram (or EKG).  ROA.3644 (PX-1 at 26).

## 2.    Evidence that Execution by Nitrogen Gassing is Cruel and Unusual Punishment.

On March 7, 2025, at the preliminary injunction hearing, the district court thoroughly evaluated the testimony of the parties' competing experts as to whether execution by nitrogen hypoxia would cause superadded terror or pain in violation of the Eighth Amendment[9] and made unassailable factual findings based off their credentials and testimony. *See* ROA.3100-10 (R. Doc. 89 at 14–24).[10]

### a.    Substantial risk of serious harm

Dr. Philip Bickler, a Board-certified anesthesiologist whom the State stipulated was an expert in the fields of anesthesiology and human hypoxia, testified on behalf of Mr. Hoffman. ROA.3100 (R. Doc. 89 at 14). The district court found Dr. Bickler "to be superbly qualified in the field of human hypoxia, owing to his long and extensive clinical work in the effect of low oxygen (hypoxia) on humans." ROA.3100-01 (R. Doc. 89 at 14–15). Rightfully so, as Dr. Bickler "has conducted at least 5,000 hypoxia studies on humans involving administering low oxygen containing gas and monitoring the subjects' responses" and "has published

---

[9] The district court assessed only Mr. Hoffman's Eighth Amendment facial challenge to execution by nitrogen hypoxia as that was sufficient to warrant entry of a preliminary injunction. ROA.3110 (R. Doc. 89 at 24). It declined to fully consider the Eighth Amendment as-applied challenge to execution by nitrogen hypoxia, but noted that there was "evidence in the record that execution by nitrogen hypoxia is cruel and unusual as applied to him." *Id.* As explained later, that evidence is sufficient for the Court to affirm the injunction as well, even if it rejects the facial challenge. *See infra.*

[10] "R. Doc." refers to the docket entries in the underlying district court action.

extensively in peer-reviewed scientific and medical journals regarding the physiological effects of hypoxia on humans and other animals." ROA.3100 (R. Doc. 89 at 14) (citing ROA.142 (Dr. Bickler's CV (ROA.3844–3910)).

To purportedly counter Dr. Bickler, the State offered Dr. Joseph Antognini, a Board-Certified anesthesiologist whom Mr. Hoffman stipulated was an expert in anesthesiology, general medicine, and physiology. ROA.3100 (R. Doc. 89 at 14). But the district court found that "Dr. Antognini has never clinically studied the effects of hypoxia on humans" and he has neither "published nor presented any studies regarding the effects of nitrogen hypoxia." ROA.3101 (R. Doc. 89 at 15). Notably, Dr. Antognini previously served as an expert for the state of Alabama—the only other state to sanction execution by nitrogen hypoxia—in every case the state has ever had concerning execution by nitrogen hypoxia, but not once did he observe any of those executions. ROA. 3101, ROA.3103(R. Doc. 89 at 19).

Given Dr. Bickler's and Dr. Antognini's professional experiences, the district court found Dr. Bickler more credible than Dr. Antognini. ROA.3103–05 (R. Doc. 89 at 17, 19).

Dr. Bickler's credible testimony included an explanation of the physiological effects of oxygen depletion, including that when nitrogen replaces oxygen in the lungs of a subject, it amounts to "forced asphyxiation" where the subject (inmate) would feel "extreme discomfort, distress, pain, and terror . . . way up to the point of

losing consciousness." ROA.3100-01 (R. Doc. 89 at 14–15). And while nitrogen hypoxia does not cause physical pain, it does cause "emotional terror." ROA.3101 (R. Doc. 89 at 15). Dr. Antognini agreed too—he acknowledged that "severe emotional suffering" would occur where "oxygen deprivation in the lungs triggers an instinctual response driven by respiratory centers in the brain that tell [the] body to breathe," yet "breathing will kill you" because of the nitrogen. ROA.3102; ROA.3503-04. Based on this testimony, as well as "common sense," the district court found that "the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror when inhalation does not deliver oxygen to the lungs," which causes "severe psychological pain" that endures until consciousness is lost. ROA.3103 (R. Doc. 89 at 17). It also credited Dr. Bickler's testimony that the conscious terror and sense of suffocation from nitrogen hypoxia can last anywhere from three to five minutes (Dr. Antognini suggested 30 to 40 seconds) if an unwilling subject decides to hold his breath to resist the urge to breathe nitrogen. ROA.3103-04 (R. Doc. 89 at 17–18).

These factual findings led the district court to conclude that Mr. Hoffman was very likely to prove that "nitrogen hypoxia poses a substantial risk of conscious terror and psychological pain." ROA.3105 (R. Doc. 89 at 19).

**b.    Alternative Methods that Would Significantly Reduce the Risk of Pain**

Mr. Hoffman proposed execution by firing squad as an alternative to nitrogen hypoxia.  As to the former, the district court credited the testimony of the *only* expert at the hearing with firearms expertise as well as personal experience having been shot in the chest—Dr. James Williams, who the State stipulated was an expert in emergency medicine and firearms.  ROA.3106-07, ROA.3227.  "Stated simply, execution by firing squad is the process of firing multiple high caliber bullets [at] someone's 'cardiac bundle,' or more generally, the heart.  ROA.3106.  "Military rifle calibers are used," and when the bullets strike the heart, the individual will become unconscious in about three to four seconds.  ROA.3106-07.  Dr. Williams' testimony led the district court to conclude that Mr. Hoffman was very likely to prove that "nitrogen hypoxia superadds pain and terror as compared to firing squad," especially where Dr. Antognini suggested that an inmate executed by nitrogen hypoxia would take about 30 to 40 seconds to lose consciousness (*i.e.*, during a suicide or workplace accident, not an execution).  ROA.3107.

## STANDARD OF REVIEW

The State misstates the correct standard of review.  "A stay is not a matter of right," and "[t]he burden is on the requesting party to show that the circumstances justify an exercise of this court's discretion." *Texas v. United States*, 126 F.4th 392, 421 (5th Cir. 2025) (quoting *Nken v. Holder*, 556 U.S. 418, 433 (2009)) (alterations

omitted).  In seeking to stay an injunction pending appeal, the Court considers four

factors:

> (1) whether the stay applicant has made a strong showing that he is
> likely to succeed on the merits; (2) whether the applicant will be
> irreparably injured absent a stay; (3) whether issuance of the stay will
> substantially injure the other parties interested in the proceeding; and
> (4) where the public interest lies.

*Texas v. United States*, 787 F.3d 733, 746–47 (5th Cir. 2015) (quoting *Planned*

*Parenthood of Greater Tex. Surgical Health Servs. v. Abbott*, 734 F.3d 406, 410 (5th

Cir. 2013)).  To succeed on the merits, the State must show that the district court

abused its discretion by entering a preliminary injunction.  *See Janvey v. Alguire*,

647 F.3d 585, 591–92 (5th Cir. 2011).  "A decision 'grounded in erroneous legal

principles is reviewed *de novo*,' and findings of fact are reviewed for clear error."

*Texas*, 787 F.3d at 747 (citation omitted).  In other words, "[a]s to each element of

the district court's preliminary-injunction analysis, the district court's findings of

fact 'are subject to a clearly-erroneous standard of review'[.]"  *Janvey*, 647 F.3d at

592 (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)).   This is a

"deferential" standard of review.  *Id.*; *see also Bluefield Water Ass'n, Inc. v. City of*

*Starkville, Miss.*, 577 F.3d 250, 253 (5th Cir. 2009).

Under the clearly erroneous standard, this [C]ourt upholds findings by the

district court that are plausible in light of the record as a whole."  *Louisiana v. Biden*,

55 F.4th 1017, 1022 (5th Cir. 2022) (quoting *Moore v. Brown*, 868 F.3d 398, 403

(5th Cir. 2017)); *see also Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74 (1985) ("If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."). "Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Anderson*, 470 U.S. at 574. So long as the district court's factual findings are "plausible," this Court "may not reverse . . . even though convinced that had we been sitting as the trier of fact, we would have weighed the evidence differently." *Yates v. Collier*, 868 F.3d 354, 363 (5th Cir. 2017) (alterations omitted) (quoting *In re Omega Protein, Inc.*, 548 F.3d 361, 367 (5th Cir. 2008)).

A factfinding is clearly erroneous "when although there is evidence to support it, the [appellate] court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573 (quoting *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948)). "This standard plainly does not entitle" the appellate court "to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently." *Id.*; *see also Grilletta v. Lexington Ins. Co.*, 558 F.3d 359, 365 (5th Cir. 2009) ("[T]his [C]ourt may not second-guess the district court's resolution of conflicting testimony or its choice of which experts to believe. . . .  [W]e give deference to the findings and

credibility choices trial courts make with respect to expert testimony." (citations omitted)).

## SUMMARY OF THE ARGUMENT

This Court should deny the State's motion to stay the district court's careful credibility-based ruling.  It is the State that has orchestrated its own "eleventh-hour" request to this Court, by obstinately refusing to disclose the existence of its execution protocol, arguing that Mr. Hoffman's attempts to challenge the protocol last year were "premature" because there "was no protocol," and halting progress of the previous methods challenge.  It is the State that has arbitrarily set an execution date at the eleventh hour, less than a month after disclosing the method of execution to Mr. Hoffman and weeks after disclosing its new, never-before-used execution protocol.  And it is the State that chose to base its case on an expert who makes his living rubber-stamping state execution protocols and has no experience in human hypoxia.  Having chosen this litigation strategy, and given that this is the first time that Louisiana will attempt to kill a human by forcing him to inhale pure nitrogen, the State should litigate this appeal with the injunction in place.

# ARGUMENT

## I. THE COURT SHOULD DENY THE MOTION FOR STAY BECAUSE THE STATE DOES NOT EVEN ATTEMPT TO ADDRESS THREE OF FOUR RELEVANT FACTORS.

At the outset, the State's request for a stay can be readily denied. The State has focused entirely on how it purportedly met the first factor for a stay (substantial likelihood of success on the merits), but is *silent* as to how it satisfies the other three requisite factors: irreparable harm to Mr. Hoffman, irreparable harm to the State, and the public interest. *See Texas*, 787 F.3d at 746–47. Each of these unaddressed factors weighs in favor of denying the requested stay.

The district court correctly found that Mr. Hoffman "will most certainly suffer irreparable harm" if his execution were to proceed because "[n]o harm is more irreparable than death." ROA.3096 (R. Doc. 89 at 10). That Mr. Hoffman would be irreparably harmed absent injunctive relief should require no discussion because of the "irreversible nature of the death penalty." *O'Bryan v. Estelle*, 691 F.2d 706, 708 (5th Cir. 1982). And so this factor "weighs heavily" in Mr. Hoffman's favor as, absent injunctive relief, he would have been dead on March 18, 2025. *Id.*

The State suggests that any irreparable harm in the form of pain or death is "self-inflicted" because that will be due to Mr. Hoffman likely choice to hold his breath as nitrogen is being administered. Stay Mot. at 23. That is an incredulous suggestion as Mr. Hoffman would not have to hold his breath, if the State had not

decided to execute him by nitrogen hypoxia. It is ultimately the State's unconstitutional method of execution that would have caused his death.

Notably, the State also has not articulated how it will be irreparably injured absent a stay—nor could it. The State will not be irreparably harmed as the preliminary injunction merely delays Mr. Hoffman's execution, which the State has already done for over a decade.[11] Delaying the execution while its constitutionality is fully considered by the judiciary will not hurt the State.

As to the public interest, the district court correctly determined that the public interest would be served by an injunction protecting Mr. Hoffman from an execution by nitrogen hypoxia as it would likely be unconstitutional, and a full trial on the merits would allow the public to scrutinize the nitrogen gassing protocol, which has been shrouded in secrecy from the public until this case. ROA.3112–14 (R. Doc. 89 at 26–28); *see also* ROA.3619-_____ (PX-1) (only the redacted nitrogen gassing protocol has been filed on the docket).

"When a preliminary injunction is sought against the [g]overnment, the interests of the [g]overnment and the public merge." *Tex. Trib.*, 121 F.4th at 525 (citing *Nken v. Holder*, 556 U.S. 418, 435 (2009)). A preliminary injunction serves the public interest where, as here, "it will prevent constitutional deprivations."

---

[11] "A stay is not a matter of right, even if irreparable injury might otherwise result to the appellant." *Texas*, 787 F.3d at 747 (quoting *Planned Parenthood*, 734 F.3d at 410).

*Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citing *Awad v. Ziriax*, 670 F.3d 1111, 1132 (10th Cir. 2012)); *see also BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("[T]he loss of constitutional freedoms 'for even minimal periods of time unquestionably constitutes irreparable injury.'" (ellipses omitted) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

That the public interest sways mightily in Mr. Hoffman's favor should be indisputable here, given the State's likely Eighth Amendment violation, as well as the public's interest in knowing how its government operates, including the use of novel execution methods on inmates.

In short, failing to show that it has met all the factors favoring a stay, the Court should not stay the injunction..

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT MR. HOFFMAN HAD A SUBSTANTIAL LIKELIHOOD OF SUCCEEDING ON THE MERITS OF HIS EIGHTH AMENDMENT CLAIMS.

Even if the Court were to excuse the State's oversight in requesting a stay and consider the merits of the preliminary injunction, it should still decline to do so. The State contends that the district court should not have concluded that Mr. Hoffman is likely to succeed on his Eighth Amendment claim because he failed to exhaust his administrative remedies under the Prison Litigation Reform Act; and in any event,

the claim fails on the merits.  These contentions fail considering the facts adduced to date and the law.

A preliminary injunction is proper where a plaintiff has demonstrated:

(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest.

*Tex. Trib. v. Caldwell Cnty., Tex.*, 121 F.4th 520, 525 (5th Cir. 2024) (citation omitted).

The district court entered a preliminary injunction because the facts from the record demonstrated that Mr. Hoffman had a substantial likelihood of success on *at least* his claim that execution by nitrogen hypoxia is facially cruel and unusual punishment in violation of the Eighth Amendment; that he would suffer irreparable harm in the form of death; and that an injunction was in the public interest. ROA.3096; ROA.3105.  The State attacks the entry of the injunction through mostly disagreements with the district court's factual findings.  But those differences in opinion—even if this Court were to share the same sentiment—are legally insufficient to conclude that the district court's fact findings were clearly erroneous. *Anderson*, 470 U.S. at 573 (the clearly erroneous standard "does not entitle a reviewing court to reverse the finding of the trier of fact simply because it is convinced that it would have decided the case differently").  So long as the district

court's findings were "plausible in light of the record as a whole," they must be upheld. *Louisiana*, 55 F.4th at 1022 (citation omitted). And they are.

**A.    Execution by Nitrogen Hypoxia Violates the Eighth Amendment's Ban Against Cruel and Unusual Punishment, Especially as Applied to Mr. Hoffman, who suffers from PTSD.**

Although the United States Constitution permits capital punishment, the Eighth Amendment "does speak to how [s]tates may carry out that punishment, prohibiting methods that are 'cruel and unusual.'" *Bucklew v. Precythe*, 587 U.S. 119, 130 (2019); *see also In re Kemmler*, 136 U.S. 436, 447 (1890) ("Punishments are cruel when they involve torture or a lingering death . . . something more than the mere extinguishment of life."). An inmate challenging a method of execution must show that the method creates a "substantial risk of serious harm" or an "objectively intolerable risk of harm" when compared to an alternative method of execution to a state's protocol that is "feasible, readily implemented, and in fact significantly reduces a substantial risk of severe pain." *Glossip v. Gross*, 576 U.S. 863, 877 (2015) (alteration omitted) (quoting *Baze v. Rees*, 553 U.S. 35, 52 (2008)). A "substantial risk of serious harm" may occur when the method of execution involves "torture or a lingering death," *Baze*, 553 U.S. at 49–50, or the "'superaddition' of 'terror, pain, or disgrace,'" *Bucklew*, 587 U.S. at 133 (quoting *Baze*, 553 U.S. at 48).

**1.    The district court appropriately found that Dr. Bickler credibly testified that Mr. Hoffman would suffer extended terror if executed by nitrogen hypoxia.**

The parties had competing experts as to whether execution by nitrogen hypoxia causes superadded terror and pain.  Importantly, the district court found that Mr. Hoffman's expert, Dr. Bickler, by virtue of his superior experience, to be *more credible* than the State's expert, Dr. Antognini.  ROA.3103 (R. Doc. 89 at 17, 19). That was not clearly erroneous.  Far from it, as the State not only stipulated that Dr. Bickler was an expert in the fields of anesthesiology and human hypoxia, but Dr. Bickler also had "conducted at least 5,000 hypoxia studies on humans involving administering low oxygen containing gas and monitoring the subjects' responses" and "had published extensively in peer-reviewed scientific and medical journals regarding the physiological effects of hypoxia on humans and other animals." ROA.3100 (R. Doc. 89 at 14) (citing Dr. Bickler's CV).  Dr. Antognini admitted he lacked such experience.  ROA.3499 (Tr. at 377:15–22).

Dr. Bickler credibly testified that when nitrogen replaces oxygen in the lungs, it amounts to "forced asphyxiation" where the inmate would feel "extreme discomfort, distress, pain, and terror . . . way up to the point of losing consciousness." ROA.3100–01 (R. Doc. 89 at 14–15).  And while nitrogen hypoxia does not cause physical pain, it does cause "emotional terror."  ROA.3101 (R. Doc. 89 at 15).  Dr. Bickler also testified that the prisoner would endure "severe emotional suffering"

where "oxygen deprivation in the lungs triggers an instinctual response driven by respiratory centers in the brain that tell [the] body to breathe," yet "breathing will kill you" because of the nitrogen. ROA.3102 (R. Doc. 89 at 16). Dr. Bickler further explained that the conscious terror and sense of suffocation from nitrogen hypoxia can last anywhere from three to five minutes, if an unwilling inmate decides to hold his breath to resist the urge to breathe nitrogen, which Mr. Hoffman is likely to do. ROA.3103–04 (R. Doc. 89 at 17–18); *see also* ROA.3374 (Tr. at 252:1–10). Dr. Bickler's credible testimony coupled with the district court's "common sense" led the district court to reasonably conclude that "the deprivation of oxygen to the lungs causes a primal urge to breathe and feelings of intense terror when inhalation does not deliver oxygen to the lungs," which causes "severe psychological pain" that endures until consciousness is lost. ROA.3103 (R. Doc. 89 at 17).

None of the district court's findings are clearly erroneous, and the State musters little to suggest otherwise.

First, the State criticizes the district court for deviating from an alleged "wall of precedent" (from mostly Alabama and the Eleventh Circuit) because that body of law has rejected similar Eighth Amendment challenges from other inmates at the preliminary injunction level. *See* Stay Mot. at 15–16, 20–21. But notably none of these cases are binding on the district court or this Court. They are not even binding for cases that arise in Alabama. *See generally* Mem. Op. & Order, *Wilson v. Hamm*,

No. 24-cv-00111-ECM (M.D. Ala. Mar. 12, 2025), ECF No. 25 (denying motion to dismiss Eighth Amendment challenge asserted by Alabama inmate subject to nitrogen execution). Those other cases were all resolved adversely against the inmates on the specific evidentiary records developed in those cases. Primarily, as the State's amicus highlights in its brief, "Alabama adopted nitrogen hypoxia as a method of execution *after a dozen inmates demanded it* as their alternative to lethal injection." Dkt. 19 at 5 (emphasis added). All four inmates in Alabama who were executed by nitrogen gas either selected that method or pled it as an alternative.[12] The challenges in Alabama were limited to pleading alternative ways of administering nitrogen gas, as the inmates were precluded from arguing that nitrogen gas itself violated the Eighth Amendment.[13] Unlike the plaintiffs in the Alabama

---

[12] Carey Grayson, Demetrius Frazier, and Alan Eugene Miller all opted for nitrogen gas as their chosen method. *See Miller v. Hamm*, 640 F. Supp. 3d 1220, 1244 (M.D. Ala. 2022); *Grayson v. Hamm*, No. 24-CV-00376-RAH, 2024 WL 4701875, at *11 (M.D. Ala. Nov. 6, 2024), *aff'd sub nom. Grayson v. Comm'r, Alabama Dep't of Corr.*, 121 F.4th 894 (11th Cir. 2024), *cert. denied sub nom. Grayson v. Hamm*, 145 S. Ct. 586 (2024); *Frazier v. Hamm*, No. 24-CV-732, 2025 WL 361172, at *3 (M.D. Ala. Jan. 31, 2025). Kenneth Smith pled nitrogen gas as an alternative to lethal injection, after the Alabama conducted a failed lethal injection attempt. *Smith v. Comm'r, Alabama Dep't of Corr.*, No. 22-13781, 2022 WL 17069492, at *5 (11th Cir. Nov. 17, 2022).

[13] *See Frazier v. Hamm*, No. 24-CV-732, 2025 WL 361172, at *4 (M.D. Ala. Jan. 31, 2025) (proposed alternative included a "pre-nitrogen sedative"); *Grayson v. Comm'r, Alabama Dep't of Corr.*, 121 F.4th 894, 897 (11th Cir. 2024) (same); *Miller v. Marshall*, No. 24-CV-197-RAH, 2024 WL 2946093, at *7 (M.D. Ala. June 11, 2024) (Miller's proposed alternative included six modifications to the gas protocol); *Smith v. Hamm*, No. 23-CV-656-RAH, 2024 WL 116303, at *4 (M.D. Ala. Jan. 10, 2024) (detailing modifications to the gas protocol that Smith pled as an alternative).

cases, Mr. Hoffman has never pled nitrogen hypoxia as an alternative. Nor does Louisiana have an opt-in statute *See* Ala. Code § 15-18-82.1(b)(2).

An even more obvious evidentiary distinction is that Dr. Bickler did not testify in any of those cases. The State makes no attempt to highlight any parallels between those evidentiary records and the one at issue here, much less identify a single instance where either the Eleventh Circuit or Supreme Court in those cases deemed any district court as having engaged in clearly erroneous factfinding. The district court did not "thumb[] its nose at those courts"; the non-binding Alabama decisions were simply based on entirely different records, procedural backgrounds, and facts. Stay Mot. at 21.

Second, the State erroneously claims that the "centerpiece" of the district court's analysis concerning whether nitrogen hypoxia causes a substantial risk of serious harm was a list of media reports regarding four Alabama executions using this method, which are all unreliable. Stay Mot. at 18–19. That grossly mischaracterizes the district court's ruling. Although the district court referenced those reports, it did not primarily rely on them because "none" of the authors of those reports "testified at the preliminary injunction" hearing. ROA.3100 (R. Doc. 89 at 14). So in their absence, the district court considered the testimony of both Dr. Bickler and Dr. Antognini, and ultimately, credited the former over the latter. ROA.3100–05 (R. Doc. 89 at 14–19). The district court then found that the media

reports merely corroborated Dr. Bickler's opinions as to how long it would likely take for an inmate to lose consciousness, i.e., more than 30 to 40 seconds.[14] ROA.3105 (R. Doc. 89 at 19).

Third, the State criticizes the district court for finding that Mr. Hoffman would hold his breath during administration of nitrogen, thus extending the amount of time for him to become unconscious—about three to five minutes[15]—and increasing his sense of terror. Stay Mot. at 21–22. But that is what Dr. Bickler reasonably expected to happen based on his stipulated expertise in hypoxia and his experience conducting thousands of hypoxia studies, as well as his personal participation in hypoxia experiments. ROA.3350–52 (Tr. at 228:15–230:5) ("I have experienced this myself in the experiments where I was a volunteer. I knew what I was getting into. . . . I knew the physiology, I knew how my body would react; yet I responded with terror. I see that same terror in the subjects what we study routinely."); ROA.3358–60 (Tr. at 236:14–238:13); ROA.3364–66 (Tr. at 242:21–244:20); ROA. 3372–74 (Tr. at

---

[14] In *Frazier*, the court deemed these media reports "insufficiently reliable" as to when nitrogen began to flow and when an inmate lost consciousness. No. 24-cv-732, 2025 WL 361172, at *11 (M.D. Ala. Jan. 31, 2025). The media reports did not serve that same purpose here. They assisted in reinforcing Dr. Bickler's opinions. ROA.3105 (R. Doc. 89 at 19).

[15] There is no credible evidence that the timeframe is any shorter. Dr. Antognini suggested that the timeframe would be 30 to 40 seconds, but that was belied by a publication that he (and Dr. Bickler) relied upon. *See* ROA.3103–04 (R. Doc. 89 at 17–19). Indeed, the State has no qualms about the district court's analysis of that publication, which suggested that breathing nitrogen could result in loss of consciousness in 30 to 40 seconds under conditions that "are not analogous to execution conditions." ROA.3104 (R. Doc. 89 at 18).

250:18–252:10).  Dr. Bickler's testimony was bolstered by Dr. Antognini, who opined that it was "a fair statement" that if one's body insists on breathing, but one's mind knows that breathing will result in death, then that creates a condition of severe emotional suffering.  ROA.3503–04 (Tr. at 381:18–382:6).  That Mr. Hoffman may be physically able to breathe as nitrogen is administered during his execution or that he plans to deploy meditative breathing techniques does not undermine the district court's finding.  *See* Stay Mot. at 22.  Whatever Mr. Hoffman expects to do can change once he is confronted by the reality of having a mask strapped to his face and forced to breathe lethal gas.  *Cf.* ROA.3350–52 (Tr. at 228:15–230:5) (Dr. Bickler explaining that when he participated in hypoxia experiments himself, "[he] knew what [he] was getting into. . . .  [He] knew how [his] body would react; yet [he] responded with terror."); ROA.3351 (Tr. at 229:6–10).

Fourth, the State distorts the record in its claim that Dr. Sautter "ran a truck through" Mr. Hoffman's case because Dr. Sautter testified that *if* Mr. Hoffman can practice breathing, then he can decrease his psychological distress. Stay Mot. at 24. Preliminarily, the district court did not rely on Dr. Sautter for any of its findings, so his testimony has no current relevance (and it is not clear to what degree the district court found him credible or not).  Even if it did, Dr. Sautter's testimony is beside the point.  There is no testimony from Dr. Sautter that Mr. Hoffman will in fact be able to practice breathing while being administered nitrogen.  ROA.3194 (Tr. at 72:17–

21) (district court sustaining objection to question about whether Mr. Hoffman would be able to practice breathing while being executed by nitrogen hypoxia). As the district court found, based on Dr. Bickler's credible testimony, Mr. Hoffman is likely to hold his breath as nitrogen is administered. And to the extent that Dr. Sautter's testimony is relevant in any respect, he testified that Mr. Hoffman will experience psychological distress if executed by nitrogen hypoxia. ROA.3193 (Tr. at 71:5–24).

Fifth, the State tries to chip away at Dr. Bickler's credibility, maintaining that Dr. Bickler conceded that in some instances, a person breathing nitrogen can black out quickly if that person is "*fooled*" into believing that nothing is "amiss," and that in the assisted-suicide context, allowing gas to flow freely into the lungs without oxygen causes a gentle hypoxic death. Stay Mot. at 24 (emphasis added). But these concessions are irrelevant. An inmate who is about to be executed by nitrogen hypoxia clearly is neither under the false impression that nothing is amiss (the inmate knows that death is imminent) nor similarly situated to someone who has asked for medically assisted suicide, which is a "very different context than forced asphyxiation with nitrogen in a death chamber." ROA.3419–22 (Tr. at 297:3–9, 298:4–25, 299:24–300:18).

Sixth, the State tries a different tact to compromise Dr. Bickler's expertise, seemingly forgetting that it actually stipulated that he was an expert in

anesthesiology *and human hypoxia*, the latter of which has direct bearing on execution by nitrogen hypoxia and for which Dr. Antognini had no expertise. ROA.3343-44 (Tr. at 221:19–222:1). The State incredibly argues that this Court should effectively reweigh the credibility of Dr. Bickler and Dr. Antognini, never mind that this Court did not observe these experts firsthand. Stay Mot. at 25–30; *see also Anderson*, 470 U.S. at 575 ("only the trial judge can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding of and belief in what is said" (citation omitted)). But this was "a classic battle of the experts," *Orduna S.A. v. Zen-Noh Grain Corp.*, 913 F.2d 1149, 1154 (5th Cir. 1990), *abrogated in part on other grounds by CITGO Asphalt Ref. Co. v. Frescati Shipping Co.*, 589 U.S. 348 (2020), and the State's expert lost the battle. "The credibility determination of witnesses, including experts, is peculiarly within the province of the district court." *Id.* The Court should not disturb the credibility determinations. *See, e.g., Grilletta*, 558 F.3d at 365 ("[T]his [C]ourt may not second-guess the district court's resolution of conflicting testimony or its choice of which experts to believe. . . . [W]e give deference to the findings and credibility choices trial courts make with respect to expert testimony." (citations omitted)). Tellingly, the State does not cite a single case where any appellate court in the country has flipped a district court's credibility determination of experts, much less under a factual record like the one here.

The State presses that Dr. Antognini has been credited by other courts in Alabama in nitrogen hypoxia cases. Stay Mot. at 26–27. But he was not up against Dr. Bickler in those cases[16]—someone who Dr. Antognini admits has more hypoxia experience than him—and there is no case authority holding that Dr. Antognini must be credited in every nitrogen hypoxia case going forward just because courts have done so in the past. The State also argues that the district court should have accepted Dr. Antognini's testimony that inhaling nitrogen will result in loss of consciousness in about 30 to 40 seconds, Stay Mot. at 27, but ignores that Dr. Antognini based that hypothesis on a publication where the experiments described therein were "not analogous to execution conditions." ROA.3104–05 (R. Dec. 89 at 18–19). The State has not disputed the district court's reading of that publication whatsoever. The State next highlights some purported hypocrisy—the district court noted that Dr. Antognini did not witness any of the Alabama executions, but did not take Dr. Bickler to task for that lack of knowledge. Stay Mot. at 27–28. Although neither

---

[16] The State takes a petty jab at Dr. Brian McAlary, who has been an opposing expert to Dr. Antognini before. *See* Stay Mot. at 27. First, and importantly, that certain courts found Dr. Antognini to be more credible than Dr. McAlary says nothing about Dr. Bickler's credibility. Second, Mr. Hoffman did not "buil[d]" his preliminary injunction motion around Dr. McAlary as even a cursory review of the supporting papers reveal. ROA.86–527 (R. Dec. 4). Third, Dr. McAlary did not testify at the preliminary injunction hearing because he was unavailable due to his obligations as a full-time anesthesiologist, unlike Dr. Antognini who has not practiced anesthesiology in six years and is seemingly a hired hand for states seeking to support their execution protocols. *See* ROA.3518-21.

expert personally observed the Alabama executions,[17] Dr. Bickler was able to compensate for that through his "thirty years of clinical research . . . studying hypoxia in humans[.]" <u>ROA.3105</u> (R. Dec. 89 at 19).

Failing to prop up Dr. Antognini's credibility, the State aims to tear down Dr. Bickler's credibility once more. Stay Mot. at 28–30. The State criticizes Dr. Bickler for never having conducted a hypoxia experiment that closely mimicked the conditions of execution by nitrogen hypoxia, but that is rich—neither has Dr. Antognini. In lieu of that, the district court permissibly found Dr. Bickler to be more persuasive than Dr. Antognini because of Dr. Bickler's "thirty years of clinical research . . . studying hypoxia in humans[.]" <u>ROA.3105</u> (R. Dec. 89 at 19). The State then posits that Dr. Bickler's brief testimony on redirect, that experiencing low levels of oxygen is extremely uncomfortable, is a "far cry" from illustrating "a substantial risk of severe pain." Stay Mot. at 30 (emphasis omitted). That of course ignores his other testimony that execution by nitrogen hypoxia will elicit a terror response. <u>ROA.3348-49</u> (Tr. at 226:19–227:20); <u>ROA.3356</u>–57 (Tr. at 234:1–235:4).

---

[17] Without any support, the State proclaims that "it is extremely difficult to secure a witness seat at any execution" in Alabama, even though Dr. Antognini has testified on multiple occasions in capital cases for Alabama. Stay Mot. at 28.

**2.    The district court appropriately credited Dr. Williams'
testimony to conclude that death by firing squad will
cause less terror than nitrogen hypoxia.**

The State stipulated to Dr. Williams' expertise in emergency medicine and firearms and offered no expert of its own in response, rendering him the only witness with expertise in firearms. ROA.3227-28 (Tr. at 105:24-25).  Thus, the district court found, as Dr. Williams explained, that firing military grade bullets at an inmate's heart would render the inmate unconscious in about three to four seconds. ROA.3106–07 (R. Doc. 89 at 20–21).  That led the district court to conclude that "nitrogen hypoxia superadds pain and terror as compared to firing squad," especially where Dr. Antognini suggested that an inmate executed by nitrogen hypoxia would take about 30 to 40 seconds to lose consciousness. ROA.3107 (R. Doc. 89 at 21).

The State seemingly concedes, as it must, that execution by firing squad is feasible and readily implemented. *See* ROA.3282 (Tr. at 160:1-12).  It only disputes whether it will lower the risk of superadded pain and suffering as compared to execution by nitrogen hypoxia.  There was, as the State emphasizes, testimony from Dr. Antognini that death by firing squad causes more *physical* pain than by nitrogen hypoxia.  Stay Mot. at 31–32.  That does not show error on the part of the district court though.  While the State professes that it is unaware of any court endorsing an alternative method of execution that is physically more painful than the challenged execution method, *see id.* at 32, there is also no case authority holding that the

proposed alternative must be less physically painful as a matter of law. In fact, the Supreme Court in *Nance v. Ward* assumed that the firing squad method was a viable pled alternative to lethal injection without even considering whether, as the State argues here, it was de facto a non-viable alternative due to the few seconds of possible pain. 597 U.S. 159, 169 (2022). The State then goes further and asserts that allowing a proposed alternative method of execution that is physically more painful, but psychologically less painful, to be a legally sufficient alternative, would make a "mockery of *Bucklew*[.]" *Id.* at 32–33. But this type of alternative is contemplated by *Bucklew*. 587 U.S. at 133 (cruel and unusual punishment superadds "*terror*, pain *or* disgrace" (emphasis added) (cleaned up)). Physical pain is only one metric by which to gauge the cruelty of any capital punishment. Terror is another. *Id.*

The State then questions whether the district court grossly misstated the decrease in terror experienced from execution by a firing squad. Stay Mot. at 33. It did not. The district court reasonably found that there would be less conscious suffering from execution by firing squad than nitrogen hypoxia, given the approximate amount of time it takes to lose consciousness under both methods, i.e., three to four seconds for the firing squad, and between 30 to 40 seconds and three to five minutes for nitrogen hypoxia. ROA.3107 (R. Doc. 89 at 21).

Lastly, the State proffers that it has legitimate penological reasons for electing execution by nitrogen hypoxia as opposed to a firing squad. Stay Mot. at 34–36.

But underlying this rationale is all attorney argument; there was neither documentary nor testimonial evidence presented on this point at the hearing. Other states have adopted firing squad for their own legitimate penological reasons.[18]

> **B.    The Court Should Affirm the Injunction on the Ground That Mr. Hoffman is Likely to Succeed on His Eighth Amendment As-Applied Challenge.**

Finding that Mr. Hoffman met his burden on his facial challenge to execution by nitrogen hypoxia under the Eighth Amendment, the district court declined to address his as-applied Eighth Amendment claim. ROA.3110 (R. Doc. 89 at 24). The district court did observe, however, "that there is evidence in the record that execution by nitrogen hypoxia is cruel and unusual as applied to [Mr. Hoffman]." *Id.* (citing Dr. Bickler's testimony). This Court should affirm the injunction on the basis of that evidence as well. *See, e.g.*, *Texas*, 809 F.3d at 178 (recognizing the familiar principle that an appellate court can affirm a district court judgment on any grounds supported by the record and affirming an injunction on "an alternate and additional ground").

Mr. Hoffman was diagnosed with post-traumatic stress ("PTSD") disorder long ago. *See generally* ROA.4140–52 (PX-20); *see also* ROA.3154 (Tr. at 32:10–

---

[18] *See* Kyle Pfannenstiel, *Idaho will be only state with firing squad as main execution method, after governor signs bill*, Idaho Capital Sun, March 12, 2025, available at https://idahocapitalsun.com/2025/03/12/idaho-will-be-only-state-with-firing-squad-as-main-execution-method-after-governor-signs-bill/?emci=dc16c47f-fdff-ef11-90cd-0022482a9fb7&emdi=8d737966-1100-f011-90cd-0022482a9fb7&ceid=556978.

14).  That diagnosis stemmed from the physical abuse Mr. Hoffman suffered at the hands of his mother from approximately the ages of 3 to 10, which "included beatings with sticks, pipes, pans, baseball bats, and frequently, with extension cords." ROA.4144, 4150 (PX-20 at 5, 11). "The beatings left welts and scars, and sometimes drew blood." ROA.4144.  "They were often administered to him while he was naked, often when wet from a shower or bath, to increase the pain." *Id.*

Dr. Bickler, who has experience treating PTSD patients, testified that nitrogen hypoxia would be a "particularly horrible" and "inhumane" method of execution for someone with PTSD.  ROA.3349-50 (Tr. at 227:21–228:3); ROA.3354 (Tr. at 232:2–10).  Anyone with "a history of PTSD when confronted" by the execution chamber "would be extremely uncomfortable." ROA.3375 (Tr. at 253:8–18).  He also explained that if "someone has an anxiety disorder" like PTSD, that person has "an emotional component that can be easily triggered." ROA.3352 (Tr. at 230:6–231:13).  Dr. Antognini offered no testimony to rebut Dr. Bickler.  ROA.3498 (Tr. at 376:19–25).  Therefore, Mr. Hoffman is very likely to show that death by nitrogen hypoxia poses a substantial risk of serious harm to him.

### C.    Mr. Hoffman Pursued Administrative Remedies, But the State Made Them Unavailable to Him.

Mr. Hoffman has submitted several grievances, which have been either rejected by the prison or held for a period of time that did not permit resolution before the initial March 18, 2025 execution date.  "Where an administrative process

does not facilitate addressing execution-related claims within the timeframe of a scheduled execution, it is likely not an 'available' remedy that must be exhausted under the PLRA." *Ramirez*, 595 U.S. at 438 (Sotomayor, J., concurring); *see also Ross v. Blake*, 578 U.S. 632, 643 (2016); *Dillon v. Rogers*, 596 F.3d 260, 267 (5th Cir. 2010).

Louisiana has a two-step grievance procedure, which requires that a prisoner (1) file a formal grievance within 90 days after an incident had occurred and, (2) appeal the grievance if it is denied. La. Admin. Code tit. 22 § 325(G)(1) (describing the first step); *id.*, (J)(1)(b) (describing the second step). But Louisiana has a unique step in its grievance procedure where prior to assigning to the first step, a grievance officer screens all grievances. *Id.*, (I)(1). At this screening stage, the grievance officer either accepts the grievance—in which case it will be processed— or the officer rejects it, meaning the grievance "will not be processed until the noted deficiency is corrected." *Id.*, (I)(1)(a). Reasons to reject grievances include, *inter alia*, "[t]he complaint concerns an action not yet taken or a decision which has not yet been made." *Id.*, (I)(1)(c)(i)(d). Importantly, per the grievance regulations themselves, "[a] rejected request is not appealable to the second step. If a request is rejected … the offender must correct the noted deficiencies and resubmit the request to the ARP screening officer." *Id.*, (I)(1)(c)(iii).

Omitted from the State's Stay Motion is the fact that Mr. Hoffman attempted twice in 2024 to request administrative remedies with the prison regarding his Eighth Amendment claim. Both times, the prison rejected his ARP, on June 7, and July 3, 2024, as follows:

> REJECTED. Your request has been rejected for the following reason(s)
>
> YOUR GRIEVANCE ALLEGING THAT VARIOUS EXECUTION METHODS CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT IN VIOLATION OF THE CONSTITUTION HAS BEEN REJECTED AS PREMATURE, AS IT CONCERNS EVENTS THAT HAVE NOT YET HAPPENED AND/OR ACTIONS OR DECISIONS THAT HAVE YET TO OCCUR. A VALID DEATH WARRANT HAS YET TO ISSUE IN YOUR CASE, AND THE LAW ENACTING THE VARIOUS EXECUTION MEANS OUTLINED IN YOUR GRIEVANCE HAS YET TO TAKE LEGAL EFFECT. FOR THE REASONS STATED ABOVE, YOUR REQUEST FOR RELIEF IS REJECTED WITHOUT CONSIDERATION ON THE MERITS. PLEASE NOTE THAT REJECTED REQUESTS FOR ADMINISTRATIVE REMEDY ARE NOT APPEALABLE TO THE SECOND STEP.

ROA.2520; ROA.2528. The prison therefore made any ARP unavailable to Mr. Hoffman, both before and after the legislative changes to La. R.S. § 15:569-570 went into effect on July 1, 2024. Then, once the State sought an execution warrant in his case, he tried again, invoking the emergency grievance procedure pursuant to La. Admin. Code tit. 22 § I-325(H)(1)(a) but was told that while this time his ARP was accepted, he would receive a Step One response within 40 days. ROA.1900-01. He did not have 40 days to live, however, at the time. He tried one last time to file a grievance on February 14, 2025, but received no response. ROA.1905-08.

In *Ross v. Blake*, the Supreme Court clearly ruled: "A prisoner need not exhaust remedies if they are not 'available.'" 578 U.S. 632, 636 (2016). The State suggests that before a prisoner may claim unavailability of the grievance process, he must file an adequate grievance. How, then, does the State account for the cases in which this Court has deemed the administrative process unavailable to inmates who filed no grievance at all? *See, e.g.*, *Davis v. Fernandez*, 798 F.3d 290 (5th Cir. 2015); *Allard v. Anderson*, 260 F. App'x 711 (5th Cir. 2007); *Aceves v. Swanson*, 75 F. App'x 295 (5th Cir. 2003); *see also Dillon v. Rogers*, 596 F.3d 260, 267 (5th Cir. 2010) (remanding for factual determination of whether ARP was available). And, the State entirely fails to account for the fact that the seminal case setting out the doctrine of availability under the PLRA, *Ross*, involved an inmate who himself acknowledged that he had not sought any remedy through the prison's ARP before filing suit. 578 U.S. at 637.

*Geter v. Baldwin State Prison*, 974 F.3d 1348 (11th Cir. 2020), is also instructive. There, the Eleventh Circuit first noted that the inmate's grievance was inadequate under the prison's policy and, even so, considered whether the process was available: "Here, both parties concede that the grievance form submitted by Geter did not comply with department policy, which is supported by the record. The parties are therefore in agreement that Geter did not properly exhaust his administrative remedies. Thus, the only dispute before us is whether the grievance

process was 'available' to Geter as contemplated by 42 U.S.C. § 1997e(a)." *Id.* at 1355.  The Eleventh Circuit ultimately remanded "for a determination in the first instance about the remedies available to Geter[.]" *Id.* at 1359. As in *Geter*, it makes no sense here to examine the content of Mr. Hoffman's ARP; it was futile because the grievance process was unavailable to him.

### D.    Even if the ARP Process were Available, which it was Not, Mr. Hoffman Exhausted His Eighth Amendment Claim (and Others) Under the Prison Litigation Reform Act.

Mr. Hoffman's grievance sufficiently notified the State of his legal challenge. Grievances must provide a factual basis "to identify problems, but need not necessarily advance specific legal theories." *Williams v. Estelle Unit Prison Offs.*, No. 23-20036, 2024 WL 3026778, at *3 (5th Cir. June 17, 2024) (citing *Johnson v. Johnson*, 385 F.3d 503, 517 (5th Cir. 2004)). An incarcerated person "need not present legal theories in his grievance[]." *Johnson*, 385 F.3d at 517.  The purpose of an ARP is fair notice. The State was on notice that Mr. Hoffman challenged his method of execution as cruel and unusual punishment under the Eighth Amendment.

The State cites *White v. Johnson*, 429 F.3d 572, 574 n.1 (5th Cir. 2005), where the Court noted in a footnote that Mr. White failed to exhaust his claim that the State might use a cut-down procedure to gain venous access. *White v. Johnson* is inapposite here.  Mr. White raised two challenges in his lawsuit: (1) a challenge to the lethal injection protocol TDCJ intended to use to execute him, and (2) a challenge

to the performance of an invasive medical procedure to gain venous access. Mr. Hoffman's present challenge is analogous to Mr. White's first challenge – a challenge to the protocol in whole. But the footnote upon which the State seemingly bases its entire argument only addresses Mr. White's second challenge. And Mr. White's second challenge was unexhausted because he failed to include it *at all* in his grievance, not because he failed to include sufficient detail. *See* Brief of Defendants-Appellees at 26–27, *White v. Johnson*, No. 05-70050 (Oct. 31, 2005) ("Although White filed a grievance with the Texas prison authorities contesting Texas' protocol on the use of certain chemicals for lethal injection … he has not filed a grievance with the Texas prison authorities contesting Texas' protocol for gaining venous access."). Nor did the Court in *White* hold or even imply that Mr. White had to propose an alternative in his ARP.

The State admits that the required level of detail in a grievance depends on each given case.  Stay Mot. at 14. The amount of information needed to "give[] officials a fair opportunity to address the problem that will later form the basis of the lawsuit" depends on the "the type of problem about which the inmate is complaining." *Johnson*, 385 F.3d at 517.   In *Johnson*, this Court considered two examples: an inmate complaining of improper conduct by a guard versus an inmate complaining of a vermin infestation in their cell. *Id.*   The Court noted that administrators would want to know who was involved, what the conduct was, when

and where it occurred, and other information about the misconduct that would permit an investigation. A grievance about a vermin infestation, on the other hand, "could adequately alert administrators to the problem whether or not the grievance names anyone." *Id.* Mr. Hoffman's ARP raising a global challenge to the State's execution protocol was adequate to alert administrators to the problem that forms the basis of this lawsuit.[19]

"[T]he purpose of the exhaustion requirement is to give prison administrators an opportunity to address a problem, and they can do this whether or not the prisoner tells them the constitutional provisions that the problem implicates." *Id.* at 518. In *Johnson*, the Court further noted that "TDCJ rules specifically instruct inmates to provide facts, not legal terminology." *Id.* Louisiana's procedure similarly instructs inmates to "present as many facts as possible" *and* the keep their grievances "as brief as possible." La. Admin. Code tit. 22 § I-325 (G)(1)(a)(ii). In light of both the general purpose of the exhaustion requirement and the Louisiana prison system's own rules, Mr. Hoffman's ARP was sufficient to exhaust his challenge to the nitrogen hypoxia protocol. *See Johnson*, 385 F.3d at 518 ("The grievances are certainly not as explicit as one would expect from a lawyer, but as we stated above

---

[19] The omission of Mr. Hoffman's preferred alternative methods from his ARP does not change the analysis. Because the alternative methods he pleads are not currently statutorily authorized, the State could not have granted his requested relief under state law.

a prisoner need not provide all of the elements of a constitutional claim as long as the grievance at least reasonably indicates a problem.").  Since Mr. Hoffman's pled alternative methods are not currently statutorily authorized, it would have been impossible for the State to address his grievance and grant him relief had he specified alternative methods in his administrative grievance

## III.  THE DISTRICT COURT ERRED IN DISMISSING THE RLUIPA CLAIM AND THERE WAS SUFFICIENT EVIDENCE TO FIND THAT MR. HOFFMAN HAD A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON IT.

The district court correctly found that Mr. Hoffman's sincere religious faith is Buddhism and Buddhist rhythmic breathing was "analogous to Western religions' practice of prayer."  ROA.3092–93 (R. Doc. 89 at 6–7).  Despite these findings, the district court erred by finding there was no "substantial burden to [Mr. Hoffman's] exercise of [Buddhist] rhythmic breathing" by substituting nitrogen for air ROA.3093 (R. Doc. 89 at 7).  Although the district court appeared to dismiss the RLUIPA claim under Rule 12(b)(6), it implicitly granted summary judgment on the claim by considering matters beyond the complaint, and thus that judgment is reviewed de novo.  *St. Paul Ins. Co. of Bellaire, Texas v. AFIA Worldwide Ins. Co.*, 937 F.2d 274, 278–79 (5th Cir. 1991).  This review examines whether a genuine issue material fact exists.  *Id.*

The district court's finding is inconsistent with the record, including Mr. Hoffman's own testimony and the testimony of an expert in Buddhism and Buddhist

practices and Mr. Hoffman's Buddhist spiritual advisor. The district court's finding also cannot be reconciled with its finding that Mr. Hoffman is substantially likely to prove that execution by nitrogen hypoxia is cruel and unusual punishment. ROA.3109–10 (R. Doc. 89 at 23–24). Finally, although the district court failed to address the second part of RLUIPA's test, the record demonstrates that the State cannot show it has a compelling interest in imposing a substantial burden on Mr. Hoffman's religious exercise and that it is using the least restrictive means to further that interest.

### A.    RLUIPA claims are evaluated by a two-part test.

RLUIPA provides:

> No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution . . . even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person—
>
> (1) is in furtherance of a compelling governmental interest; and
>
> (2) is the least restrictive means of furthering that compelling governmental interest.

42 U.S.C. § 2000cc-1(a).

RLUIPA claims are thus evaluated by a two-part test: the claimant bears the burden of showing a substantial burden on his religious exercise; the burden then shifts to the government to show that it has a compelling interest in the challenged

practice and that it is using the least restrictive means to further that interest.  42 U.S.C. § 2000cc-1(a); *Ramirez v. Collier*, 595 U.S. 411, 425 (2022).

**B.    The district court erred by determining the reasonableness and significance of Mr. Hoffman's Buddhist beliefs.**

With respect to the first part of RLUIPA's test, substantial burden, the Supreme Court explained that this analysis ***defers*** to the claimant's subjective religious beliefs.  *Holt v. Hobbs*, 574 U.S. 352, 361–62 (2015).  Courts are not to gauge the reasonableness or significance of the claimant's religious practices. *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 715–16 (1981).

In finding that Mr. Hoffman's sincerely-held Buddhist beliefs would not be substantially burdened during his execution by being forced to breathe deadly nitrogen gas as opposed to air (ROA.3093 (R. Doc. 89 at 7)), the district court improperly gauged the reasonableness and significance of Mr. Hoffman's religious beliefs.  Specifically, the district court found that "substituting nitrogen for atmospheric air does not substantially burden Hoffman's ability to breath" and "there is no substantial burden to [Mr. Hoffman's] exercise of rhythmic breathing" by substituting nitrogen for air.  ROA.3092–93 (R. Doc. 89 at 6–7).

The district court made this finding because the two Buddhist clerics who testified—Reverend Bono and Brother Smith—did not cite to "religious text or instruction by the historical Buddha in support of this proposition."  ROA.3092 (R. Doc. 89 at 7 & n.44).  Contrary to the district court's finding, there is no requirement

in RLUIPA that subjective religious beliefs must be documented in religious text or instruction.  *See Fox v. Washington*, 949 F.3d 270, 278 (6th Cir. 2020) ("The substantial-burden question turns on the impact of a government regulation on the individual inmate, not the centrality of those beliefs to canonical texts as interpreted by judges or prison officials.") (internal quotation marks and citation omitted). Instead, "a prisoner's requested accommodation 'must be sincerely based on a religious belief and not some other motivation[.]'" *Ramirez*, 595 U.S. at 425 (quoting *Holt*, 574 U.S. at 360–61).  "The burden on the prisoner's religious exercise must also be 'substantial.'" *Id.* (quoting *Holt*, 574 U.S. at 361).

In determining the merits of Mr. Hoffman's RLUIPA claim, the district court found that his Buddhist beliefs were sincere.  Specifically, the district court found that "meditative breathing is an exercise attendant to practicing Hoffman's chosen faith of Buddhism." ROA.3092 (R. Doc. 89 at 6).  The district court further found "that Buddhism calls its adherents to a ritual of breathing rhythmically to achieve a mediative state, what the clerics referred to as 'zen.'  This is analogous to Western religions' practice of prayer." ROA.3093 (R. Doc. 89 at 7).

Despite finding that Mr. Hoffman has sincere Buddhist beliefs, the district court went on to find that execution by nitrogen hypoxia would not substantially burden Mr. Hoffman's Buddhist beliefs.  Contrary to the district court's findings, the record demonstrates that breathing meditation is central to Buddhism and is of

even more significant at the moment of death. Mr. Hoffman testified that he will not be able to practice his Buddhist meditative breathing once execution by nitrogen hypoxia is underway because his mask will be filled with nitrogen gas. ROA.3153 (Tr. at 31:15–17).[20] Reverend Bono and Brother Smith gave expert and lay opinions, respectively, that breathing air is a necessary element of the practice of Buddhism. ROA.3171 (Tr. at 49:21–24); ROA.3173–74 (Tr. at 51:20–52:1); ROA.3225 (Tr. at 103:13–19). Both testified that execution by nitrogen hypoxia would inhibit Mr. Hoffman's practice of Buddhism because he will not be breathing air. ROA.3173 (Tr. at 49:12–14); ROA.3325 (Tr. at 103:9–19).

Thus, the district court failed to defer to Mr. Hoffman's subjective religious belief that breathing air is a necessary element of the practice of Buddhism. *See Holt*, 574 U.S. at 361–62. Instead, the district court improperly gauged the reasonableness or significance of Mr. Hoffman's Buddhist practices by requiring that Mr. Hoffman and other witnesses cite religious text or instruction to support Hoffman's beliefs. *See Thomas*, 450 U.S. at 715–16.

---

[20] Mr. Hoffman also set forth the same or similar allegations in his Complaint. ROA.24; ROA.49; ROA.67 (Compl. ¶¶ 11, 134–36, 234-38).

**C.    The district court's dismissal of the RLUIPA claim is inconsistent with other findings made by the district court in its Order.**

The district court's dismissal of the RLUIPA claim is inconsistent with findings made by the district court elsewhere in its Order that execution by nitrogen hypoxia is cruel and unusual punishment.  ROA.3096–3110 (R. Doc. 89 at 10–24). In particular, the district court found "that Plaintiff has clearly shown that he is substantially likely to prove that nitrogen hypoxia poses a substantial risk of conscious terror and psychological pain." ROA.3105 (R. Doc. 89 at 19).

In finding that execution by nitrogen hypoxia is cruel and unusual punishment, the district court relied on Dr. Bickler's expert opinions, including that that nitrogen hypoxia "is forced asphyxiation, gassing a subject to death, exposing [Mr. Hoffman] to a lack of oxygen such that both extreme discomfort, distress, pain, and terror would be felt all the way up to the point of losing consciousness." ROA.3101–02 (R. Doc. 89 at 15–16) (citing ROA.3154–55 (Tr. at 226:24–227:3)). The district court further relied on Dr. Bickler's expert opinions that "the ability to cooperate (repeatedly inhale deeply) would require the condemned to mentally overcome the primal urge to breathe that is triggered by lack of oxygen." ROA.3102 –03 (R. Doc. 89 at 16–17) (citing ROA.3333 (Tr. at 211)).  The district court also relied on accounts from all four Alabama executions that described "suffering, including conscious terror for several minutes, shaking, gasping, and other evidence

of distress." ROA.3099 (R. Doc. 89 at 13). This included eyewitness accounts of "repeated gasping while conscious," "heaving and spitting," and "two minutes of shaking and trembling 'followed by about six minutes of periodic gulping breaths before [becoming still].'" ROA.3099 (citations omitted).

The record clearly demonstrates that execution by nitrogen hypoxia will substantially impact Mr. Hoffman's ability to breathe. Conversely, the district court found that breathing air is a necessary element of Mr. Hoffman's practice of Buddhism. ROA.3093 (R. Dec. 89 at 7). Thus, the district court's finding that execution by nitrogen hypoxia would not substantially burden Mr. Hoffman's Buddhist beliefs cannot be reconciled with its findings elsewhere that execution by nitrogen hypoxia will substantially impact the Mr. Hoffman's ability to breath.

### D.     The State cannot show that it has a compelling interest that is narrowly tailored.

The district court also failed to address the second part of RLUIPA that requires the State to prove it has a compelling interest that is narrowly tailored to achieve that compelling interest. *See Holt*, 574 U.S. at 362–65. The least restrictive means standard is "exceptionally demanding." *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 728 (2014); *see also Moussazadeh v. Tex. Dep't of Crim. Just.*, 703 F.3d 781, 795 (5th Cir. 2012) ("Requiring a State to demonstrate . . . that it has adopted the least restrictive means of achieving [a compelling] interest is the most

demanding test known to constitutional law." (internal quotation marks and citation omitted)).

Although it was not addressed by the district court, the record demonstrates that the State cannot meet its burden under the second part of RLUIPA's test to establish a compelling interest and prove that execution by nitrogen gas is the least restrictive means to further that interest.  In particular, the State admitted that it has not seriously considered Mr. Hoffman's proposed alternative methods of execution: firing squad and DDMAPh.  ROA.3281 (Tr. at 159:7–9, 159:16–18); *see Smith v. Comm'r, Ala. Dep't of Corrs.*, 844 F. App'x 286, 292 (11th Cir. 2021) ("If a less restrictive means is available for the Government to achieve its goals, the Government must use it. . . . In deciding whether a policy is the least restrictive means, courts must inquire into whether efficacious less restrictive measures *actually exist*." (internal quotation marks and citations omitted)).  Indeed, in analyzing other claims, the district court found that Mr. Hoffman clearly showed a substantial likelihood that execution by firing squad is feasible, readily implemented, significantly reduces a substantial risk of severe pain, and "the State has failed to adopt firing squad as a method of execution without a legitimate penological reason." ROA.3108 (R. Doc. at 22).

*   *   *

For these reasons, the Court should reverse the district court's denial of Mr. Hoffman's motion for reconsideration on the dismissal of the RLUIPA claim.

### E.   The District Court Erred by Finding Mr. Hoffman Does Not Have a Substantial Likelihood of Success of Prevailing on His Right to Counsel and Access to the Courts Claim (Count IV).

Mr. Hoffman has a constitutional right to meaningful access to the courts pursuant to the First and Fourteenth Amendments, as well as a Sixth Amendment right to counsel at all critical stages of a criminal proceeding. *See Bounds v. Smith*, 430 U.S. 817, 821-23, 828 (1977).   The right to court access is the "most 'fundamental political right, because [it is] preservative of all rights.'" *Hudson v. McMillian*, 503 U.S. 1, 15 (1992) (Blackmun, J., concurring in the judgment) (quoting *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886)).   The district court erred in finding that Mr. Hoffman failed to show that he has a substantial likelihood of prevailing on Count IV under the First, Sixth, and Fourteenth Amendments because the State's execution protocol denies him access to the courts.   ROA.3111–12.

The district court incorrectly based its findings on this Court's decision in *Whitaker v. Collier*, 862 F.3d 490, 501 (5th Cir. 2017).   ROA.3112.   *Whitaker* is distinguishable from the record here because the *Whitaker* plaintiffs' access to court claim was brought under the First, Sixth, and ***Eighth*** Amendments. *Whitaker*, 862 F.3d at 501.   Here, Mr. Hoffman brought his claim under the First, Sixth, and ***Fourteenth*** Amendments.   ROA.63–65.   Therefore, *Whitaker*'s holding finding the

plaintiffs had not satisfied the pleading requirement of *Glossip v. Gross*, <u>576 U.S. 863, 867-77</u> (2015), does not apply in this case because the *Whitaker* plaintiffs did not bring their access to courts claim under the Fourteenth Amendment.  *Whitaker*, <u>862 F.3d at 501</u>.

Further, this Court's decision in *Whitaker* concerned the "right to counsel" and found that the "Sixth Amendment right to counsel only 'extends to the first appeal of right, and no further.'" *Id.* (quoting *Pennsylvania v. Finley*, <u>481 U.S. 551, 555</u> (1987)).  Here, Mr. Hoffman's claim is a claim regarding ***access*** to the courts, not a ***right to counsel***, and addresses the requirement that prisoners be afforded "a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts."  *Bounds v. Smith*, <u>430 U.S. 817, 825</u> (1977).

Louisiana is one of only a few states that does not expressly provide for the presence of counsel, or even allow the condemned inmate to select a witness of any kind, at an execution.  Instead, Louisiana's execution protocol states that all visits to the condemned inmate must end by 3:00 p.m. on the day of the execution, but allows attorneys to stay with the inmate at the Warden's discretion.  <u>ROA.3624</u>. It is not, however, within the Warden's discretion to allow the inmate's attorney to witness the execution. Only Secretary Westcott can make that decision, and he has decided not to allow Mr. Hoffman to have his counsel witness his execution. <u>ROA.3341</u>.

In Louisiana, during an execution, the only avenue allowing the condemned inmate access to the courts is the presence of counsel who has access to a telephone. Mr. Hoffman has the Eighth Amendment right not to be subjected to cruel and unusual punishment, and at no other time is that right more important than during execution. Mr. Hoffman's right to meaningful access to the courts in order to assert that right requires that counsel have access to him during the last hours before the execution, be permitted to witness the execution, and have access to a telephone until the execution has been carried out.[21]

The correct question before this Court is whether Louisiana's "execution policies afford [Mr. Hoffman] a reasonably adequate opportunity to present claimed constitutional violations during [his] execution[]." *McGehee*, 463 F. Supp. 3d at 925.

Mr. Hoffman has the right under the Sixth and Fourteenth Amendments to access to counsel at all "critical" stages of criminal proceedings. *United States v. Wade*, 388 U.S. 218, 227-28 (1967), including throughout the execution procedure

---

[21] Courts in other jurisdictions have recognized this right. *See Coe v. Bell*, 89 F. Supp. 2d 962, 966-67 (M.D. Tenn. 2000) (holding that the prison must provide the plaintiff with "access to his counsel during the last hour before the execution and to have his counsel witness the execution" and "counsel must have access to a telephone with an unimpeded outside line at the time that he or she witnesses the execution"), *vacated as moot*, 230 F.3d 1357 (6th Cir. 2000); *see also McGehee v. Hutchinson*, 463 F. Supp. 3d 870, 921-31 (E.D. Ark. 2020) (finding in plaintiffs' favor on their right to access courts claim regarding the number of lawyers allowed to view the execution and access to a cell phone); *Cooey v. Strickland*, No. 2:04-cv-1156, 2010 U.S. Dist. LEXIS 81841, at *28 (S.D. Ohio Aug. 12, 2010) (holding that "Defendants' reliance on the protocol in refusing to permit Broom to speak with counsel and in denying counsel's request to speak with Broom" established a facially plausible claim).

and during the execution. *See Harbison v. Bell*, 556 U.S. 180, 194 (2009). "The right of access to the courts . . . assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights." *Wolff v. McDonnell,* 418 U.S. 539, 579 (1974).

The district court failed to apply the four-factor test set forth in *Turner v. Safley*, 482 U.S. 78, 89 (1987), to determine the reasonableness of the State's execution protocol. These factors are: (1) whether there is a "'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"; (2) "whether there are alternative means of exercising the right that remain open to prison inmates"; (3) the "impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally"; and (4) "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.* at 89-90 (citations omitted).

Applying the *Turner* factors here, the record is devoid of a valid government interest that supports the State's decision to ban counsel from witnessing the execution. No alternative means exist for Mr. Hoffman to exercise his right of access to the courts, as he will be strapped down to a gurney and a mask will be tightly strapped onto his face. For counsel to serve as an execution witness and have access to a phone would have no detrimental impact on guards or other inmates. "The state

certainly has no legitimate interest in depriving the Plaintiff of access to the courts to assert a claim of cruel and unusual treatment." *Coe*, 89 F. Supp. 2d at 966. And, there are no alternatives to ensure that Mr. Hoffman can access the courts during his execution. *See Turner*, 482 U.S. at 89-90.

Without access to counsel and access to the courts, Mr. Hoffman would not be able to seek court intervention if something goes wrong during his execution. Mr. Hoffman has pled both facial and as-applied challenges to Louisiana's nitrogen gassing protocol, asserting that it is likely to cause him substantial harm in the form of severe pain and emotional torture. Particularly given that Louisiana is using Mr. Hoffman as a test case for a new and unusual method of execution that has never been attempted in this state or by these individuals, the risk is too great to deny Mr. Hoffman access to the courts and to counsel during his execution.[22]

Accordingly, based on the record, Mr. Hoffman is likely to succeed on his claim that the execution protocol violates his rights to access to counsel and the courts under the First, Sixth, and Fourteenth Amendments.

---

[22] The execution of Joseph Wood in Arizona on July 23, 2014, demonstrates the necessity of immediate judicial review during the execution process. After his execution began, Mr. Wood remained alive for more than an hour, "gasping and snorting." *Wood v. Ryan*, No. 14-CV-1447-PHX-NVW, Telephonic Motion for Emergency Stay of Execution at 1 (D. Ariz. July 23, 2014). Mr. Wood's attorneys were forced to leave the witness room to seek a stay of execution during a telephonic hearing with a federal judge, requesting that the Court direct the prison to take lifesaving measures as required by their protocol. *Id.*

-58-

## **CONCLUSION**

For the foregoing reasons, the Court should deny the motion for a stay and

maintain the injunction.

Respectfully submitted this 13th day of March, 2025.

/s/ *Cecelia Trenticosta Kappel*
Cecelia Trenticosta Kappel, La. Bar No. 32736
Loyola Center for Social Justice
7214 St. Charles Ave. Box 907
New Orleans, Louisiana 70118
Tel: 504-861-5735
ckappel@defendla.org

Samantha Bosalavage Pourciau, La. Bar No. 39808
The Promise of Justice Initiative
1024 Elysian Fields Avenue
New Orleans, LA 70117
Tel: (504) 529-5955
sbosalavage@defendla.org

Rebecca L. Hudsmith
Office of the Federal Public Defender
For the Middle and Western Districts of Louisiana
102 Versailles Blvd., Suite 816
Lafayette, LA 70501
Tel: 337-262-6336
Rebecca_Hudsmith@fd.org

Hugham Chan
Crowell & Moring LLP
1001 Pennsylvania Avenue, NW
Washington, DC 20004
Tel: (202) 624-2500
HChan@crowell.com

*Counsel for Plaintiff-Appellee/Cross-Appellant*
*Jessie Hoffman*

## <u>CERTIFICATE OF SERVICE</u>

On March 13, 2025, this brief was served via CM/ECF on all registered counsel and transmitted to the Clerk of the Court. Counsel further certifies that: (1) any required privacy redactions have been made in compliance with Fifth Circuit Rule 25.2.13; and (2) the document has been scanned with the most recent version of Webroot Endpoint Protection CE 23.4 and is free of viruses.

/s/ *Hugham Chan*
Hugham Chan

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that this opposition complies with the requirements of <u>Fed. R. App. P. 32(a)(5)</u> and (6) because it has been prepared in 14-point Times New Roman, a proportionally spaced font.

I further certify that this brief complies with the type-volume limitation of <u>Fed. R. App. P. 27(d)(2)(A)</u> because it contains 14,233 words, excluding the parts of the opposition exempted, according to the count of Microsoft Word.

/s/ *Hugham Chan*
Hugham Chan